# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
Filed: August 31, 2026

| | | |
|---|---|---|
| DONNA GILBERT, Petitioner, | * | No. 20-744V |
| v. | * | Special Master Young |
| SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | * | |

*Maximillian J. Muller*, Muller Brazil, LLP, Dresher, PA, for Petitioner.
*Kimberley Shubert Davey*, U.S. Department of Justice, Washington, DC, for Respondent.

**DECISION ON ENTITLEMENT**[1]

On June 22, 2020, Donna Gilbert ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"). 42 U.S.C. § 300aa-10 et seq. (2018).[2] Pet., ECF No. 1. Petitioner alleged that she developed Guillain-Barré Syndrome ("GBS")[3] and small-fiber neuropathy ("SFN")[4] as a result of the influenza ("flu") vaccine she received on October 6, 2017. *Id.* at 1.

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.
[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).
[3] GBS is a "rapidly progressive ascending motor neuron paralysis of unknown etiology, frequently seen after an enteric or respiratory infection." *Guillain-Barré Syndrome*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlan dsonline.com/dorland/definition?id=110689 (hereinafter, "DORLAND'S").
[4] SFN is "a type of neuropathy in which only the small sensory cutaneous nerves are affected." *Small Fiber Neuropathy*, DORLAND'S.

A careful analysis and weighing of all the evidence presented in this case in accordance with the applicable legal standards[5] reveals that Petitioner has failed to provide preponderant evidence that the flu vaccine she received on October 6, 2017, caused her to suffer from sensory GBS or SFN. Accordingly, Petitioner is not entitled to an award of compensation.

## I. Procedural History

Petitioner filed her petition, medical records, and records related to her workers' compensation claim on June 22, 2020. Pet.; Pet'r's Exs. 1–14, ECF No. 1. Petitioner filed the Pre-Assignment Review ("PAR") Questionnaire and a statement of completion on June 30, 2020. ECF Nos. 5–6.

Respondent filed his Rule 4(c) report, opposing compensation, on May 6, 2021. Resp't's Rep., ECF No. 15. On January 27, 2022, Petitioner filed an expert report from Noah Kolb, M.D., along with his curriculum vitae ("CV") and supporting literature. Pet'r's Exs. 15–25, ECF No. 18. On July 18, 2022, Respondent filed expert reports from Brian Callaghan, M.D., and Chenthamarakshan Vasu, Ph.D., along with their CVs. Resp't's Exs. A–D, ECF No. 22. Respondent later filed supporting medical literature on August 17, 2022. Resp't's Ex. A (Tabs 1–4), Resp't's Ex. C (Tabs 1–22), ECF No. 23. Petitioner filed a supplemental report and supporting medical literature from Dr. Kolb on January 19, 2023. Pet'r's Exs. 26–27, ECF No. 27. Petitioner filed additional medical literature on March 7, 2023, and filed a letter from Petitioner's treating neurologist, Jay Varrato, M.D., on April 13, 2023. Pet'r's Ex. 28, ECF No. 30; Pet'r's Ex. 29, ECF No. 32.

On February 1, 2024, I scheduled an entitlement hearing for March 20, 2025. ECF No. 33. Petitioner filed her pre-hearing brief and additional medical literature on November 21, 2024. Pet'r's Exs. 30–37, ECF No. 35; Pet'r's Br., ECF No. 36. Respondent filed his response on January 20, 2025. Resp't's Response, ECF No. 37. Between January 23, 2025, and February 11, 2025, Petitioner filed several additional pieces of medical literature. Pet'r's Exs. 38–47, ECF No. 38; Pet'r's Exs. 48–52, ECF No. 39. Petitioner filed her reply brief, along with her prehearing submissions, on February 14, 2025. Pet'r's Reply, ECF No. 40; ECF Nos. 41–43. Respondent filed his prehearing submissions and updated CVs for Dr. Callaghan and Dr. Vasu on February 18, 2025. Resp't's Exs. E–F, ECF No. 44; ECF Nos. 45–46. Petitioner filed additional medical records on February 19, 2025. Pet'r's Ex. 53, ECF No. 47.

An entitlement hearing was held in this case on March 19, 2025. Min. Entry, docketed March 20, 2025. No post-hearing briefs were filed. This matter is now ripe for consideration.

[5] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the Ruling will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

## II. Medical History

Petitioner's medical history prior to vaccination was significant for Hashimoto's disease[6] with hypothyroidism,[7] abnormal pap smears, back pain, joint pain, and elbow tendinitis. Pet'r's Ex. 3 at 13–14; Pet'r's Ex. 14 at 1596, 1600–04, 1612–16; Pet'r's Ex. 14-5 at 1609. On October 6, 2017, Petitioner received the subject flu vaccine at Lehigh Valley Health Network Employee Health Services, where she was employed as a nurse practitioner ("NP"). Pet'r's Ex. 1 at 1; Pet'r's Ex. 3 at 15.

On October 13, 2017, Petitioner presented to the emergency department ("ED") at Lehigh Valley Health with complaints of numbness and tingling in her legs for "the last [f]ew days," as well as a feeling of pins and needles in her arms and the left side of her face. Pet'r's Ex. 4 at 54. Petitioner also reported heaviness and weakness in her legs upon her arrival to work in the morning, which prompted her visit to the ED. *Id.* She stated she received the flu vaccine the week prior and told her provider that "[she] think[s she is] getting [GBS]." *Id.* Her physical examination was "unremarkable including a full NIH stroke scale with a score of 0, reflexes normal." *Id.* Petitioner's attending physician, Andrew Sheen, D.O., noted a concern for GBS due to the recent flu shot and numbness symptoms. *Id.* Petitioner "progressed to have distal reduced reflexes" and was admitted the same day for further workup and a planned lumbar puncture. *Id.*

Petitioner's lumbar puncture was completed on October 14, 2017, and was normal. Pet'r's Ex. 4 at 75. On October 17, 2017, Petitioner underwent an electromyogram ("EMG"), which was also normal. *Id.* at 135. Petitioner also had negative testing for Lyme disease. *Id.* at 136. Petitioner's neurologist, Gary Clauser, wrote her discharge instructions on October 19, 2017, and he noted that Petitioner's symptoms began "five days prior to admission." *Id.* at 49. In addition to the above negative testing, Dr. Clauser noted that magnetic resonance imaging ("MRI") of Petitioner's cervical spine was normal. *Id.* "Even with normal results, concern for GBS." *Id.* Dr. Clauser treated Petitioner with intravenous immunoglobulin ("IVIG") over the course of five days during her hospitalization, which he reported improved her symptoms. *Id.* Petitioner was discharged home and instructed to follow up with neurology in two to three weeks. *Id.*

On October 23, 2017, Petitioner contacted neurologist Glenn Mackin with concerns that her paresthesias had returned. Pet'r's Ex. 14-4 at 106. Petitioner reported the paresthesias to be "annoying" but not painful, and Dr. Mackin advised her that "it may be quite some time" for all her symptoms to subside. *Id.* He opined that her condition was more consistent with GBS than chronic inflammatory demyelinating polyneuropathy ("CIDP") and advised her to contact him again if her symptoms began to "creep" up her arms and legs or if she developed imbalance, sphincter dysfunction, or recurrent definite weakness. *Id.*

On October 31, 2017, registered nurse ("RN") Jeri Lemanek filed a Vaccine Adverse Event Reporting System ("VAERS") report on Petitioner's behalf. Pet'r's Ex. 12 at 20. RN Lemanek reported the onset of Petitioner's symptoms as October 13, 2017, and described her symptoms as

---

[6] Hashimoto's disease is "a progressive type of autoimmune thyroiditis with lymphocytic infiltration of the gland and circulating antithyroid antibodies." *Hashimoto Disease*, DORLAND'S.

[7] Hypothyroidism is "deficiency of thyroid activity, characterized by decrease in basal metabolic rate, fatigue, and lethargy." *Hypothyroidism*, DORLAND'S.

numbness and tingling in the arms, legs, and left side of face, as well as leg weakness, with a "tentative diagnosis of [GBS]." *Id.*

Petitioner returned to the neurology department at Lehigh Valley Health on November 7, 2017, and was seen by physician's assistant ("PA") Krista Remmel. Pet'r's Ex. 5 at 9. Petitioner reported the progress of her symptoms as beginning with numbness in her left cheek, which then progressed to her hands and forearms before experiencing "paresthesias in the bilateral legs up to her thighs." *Id.* Petitioner reported feeling better since her discharge, though she was still experiencing paresthesia in her hands and feet, and reported her gait as being "off." *Id.* at 10. She also reported a "urinary urgency since the hospital." *Id.* On examination, Petitioner displayed reduced pinprick sensation in her forearms and lower legs, mild weakness, and decreased reflexes at her ankles. *Id.* at 10–12. PA Remmel prescribed Petitioner gabapentin to help with her paresthesia and stated that Petitioner would remain out of work for one month while she recovered. *Id.* at 12.

On November 20, 2017, Petitioner called the neurology department at Lehigh Valley Health requesting a letter to extend her time off work until January 2, 2018, as "she [was] having nerve pain and fe[lt] she just need[ed] more time." Pet'r's Ex. 14-4 at 129. PA Remmel agreed to provide the letter and stated that Petitioner would have no restrictions upon her return to work "unless she fe[lt] differently." *Id.*

RN Ashley Fidishun called Petitioner on November 30, 2017, to discuss PA Remmel's letter. Pet'r's Ex. 14-4 at 130. Petitioner reported that she did not feel comfortable returning to work yet and that she could walk, but "that the more activity she d[id], her symptoms return[ed] and the neuropathy worsen[ed]." *Id.* Petitioner reported severe nerve pain and requested a more detailed letter to provide to her employee health department to explain the disease process. *Id.*

Petitioner presented to NP Susan Newhart on December 6, 2017, to follow up for her GBS. Pet'r's Ex. 5 at 28. Petitioner reported experiencing neuropathic pain in her hands, wrists, fingers, and legs, as well as weakness and swelling in her right arm. *Id.* at 29. On examination, Petitioner continued to display mild weakness, reduced sensation, and decreased reflexes at her ankles. *Id.* at 31. Petitioner's gabapentin was causing her dizziness, and NP Newhart discussed a plan to titrate her dosage. *Id.*

On December 19, 2017, Petitioner began physical therapy ("PT") sessions with Lehigh Valley Health Rehabilitation services. Pet'r's Ex. 6 at 7. Petitioner stated that she had a "tingly feeling" in both hands and feet, along with a periodic "buzzing sensation," but that her numbness and pins and needles had subsided. *Id.* She also reported that she could only stand for 15 minutes before her leg pain worsened. *Id.* On examination, her physical therapist noted weakness in both legs, more in her right than her left, "which impact[ed] her gait, balance[,] and ability to stand." *Id.* at 9. Petitioner attended regular PT for the next 18 months, until July 11, 2019. *See generally* Pet'r's Ex. 6.

Petitioner presented for an initial consultation with neurologist Jay Varrato, D.O., on January 11, 2018. Pet'r's Ex. 5 at 38. Petitioner reported that her symptoms of numbness in her left cheek began "about [three] days after [the] flu shot" before progressing to her hands, forearms, and "legs up to her thighs." *Id.* Petitioner reported that she "rarely" got a pins and needles

sensation, but that she had a "toothache-like feeling her in legs" and she felt "a bit rubbery when walking." *Id.* Petitioner also reported fatigue and balance problems. *Id.* She also "note[d] some emotional distress [] as she ha[d] not been able to return to work and fe[lt] like she should be improving quicker. Husband d[id] note bouts of anxiety." *Id.* On examination, Petitioner displayed mildly reduced strength in her right arm and right leg hip flexors, and reduced pinprick, light touch, and temperature sensation in her legs. *Id.* at 40. Dr. Varrato agreed with Petitioner's diagnosis of GBS and explained to Petitioner that early testing of GBS can result in normal lumbar puncture and EMG results. *Id.* at 41. He also stated that Petitioner likely did not have CIDP or another progressive demyelinating neuropathy and recommended Petitioner undergo a repeat EMG. *Id.* Dr. Varrato gave Petitioner a referral for psychiatry due to her anxiety and added that he did not feel Petitioner was able to return to work at this time. *Id.* at 41–42.

Petitioner returned to Dr. Varrato on February 23, 2018, to discuss the results of her recent EMG study. Pet'r's Ex. 5 at 56. The EMG of her right arm and right leg were normal, though Petitioner continued to complain of "a lot of tingling numbness and pain in the hands and feet." *Id.* PT was improving her balance, but Dr. Varrato noted that Petitioner was "very emotional with increased anxiety" about her condition. *Id.* Petitioner's physical examination was positive for fatigue, daytime sleepiness, restless legs, blurred vision, muscle weakness, myalgias, itching, confusion, dizziness, numbness, tingling in her arms and legs, tremors, feelings of unsteadiness, and depression. *Id.* at 57. Due to her normal EMG and lumbar puncture, Dr. Varrato ordered MRIs of Petitioner's brain and cervical spine and advised her to continue to follow up with psychiatry. *Id.* at 60. Dr. Varrato also continued to opine that Petitioner was not ready to return to work. *Id.*

On March 9, 2018, Petitioner presented to psychiatrist Susan Wiley at the referral of Dr. Varrato. Pet'r's Ex. 14-2 at 141. Dr. Wiley noted that Petitioner's chief complaint was feeling "both anxious and depressed in response to her [GBS]." *Id.* Petitioner reported that the onset of her GBS occurred six days after her receipt of the flu vaccine. *Id.* Petitioner further reported that her current symptoms were "intolerable," including tingling and pins and needles in her hands and feet, aching, and fatigue that were affecting her ability to sleep. *Id.* Petitioner stated that she felt she had "an invisible disease" and that she was struggling with the "uncertainty of her prognosis," as "[e]veryone told her to calm down[,] but she made her own diagnosis." *Id.* Dr. Wiley prescribed Petitioner Celexa and advised her to follow up in four to six weeks while she continued counseling. *Id.* at 147.

Petitioner presented to occupational health physician Kevin Vrablik on April 3, 2018, to assess her ability to return to work. Pet'r's Ex. 12 at 7. Dr. Vrablik cleared Petitioner to work four hours per day, however, Petitioner stated "I don't work, I rely on my husband," and requested to visit with her neurologist. *Id.* Petitioner refused to schedule a future appointment with employee health until April 27, 2018, and declined to return to work based on Dr. Vrablik's recommendation. *Id.*

Petitioner visited Dr. Varrato on April 9, 2018, and reported feeling "slightly stronger" with less generalized weakness, but reported "a lot of numbness and sensory changes. Pet'r's Ex. 5 at 67. Petitioner reported that she was "unable to return to work as she f[ound] it difficult to concentrate and tough to type." *Id.* Petitioner's MRIs of her brain and cervical spine were normal. *Id.* Dr. Varrato opined that Petitioner had "slow to improve sensory GBS with no evidence of large fiber involvement" and that Petitioner's physical examination had not changed since her last visit.

*Id.* at 70. Given her symptoms, Dr. Varrato opined that Petitioner was not ready to return to work at this time. *Id.* at 71.

Throughout April, Petitioner was under surveillance by workers' compensation investigators who observed her completing activities at home and outside of her home, including shopping, driving, and social visits, without observing what the investigators considered to be any apparent restrictions. Pet'r's Ex. 14-1 at 3–50. One investigator testified that on April 30, 2018, the day of Petitioner's workers' compensation hearing, Petitioner appeared to walk with a "very slight limp that [he] didn't notice from any of the other days of surveillance or any of those times." Pet'r's Ex. 14-5 at 355.

Petitioner returned to Dr. Varrato on May 23, 2018, and reported that she had lost her job and was currently receiving workers' compensation. Pet'r's Ex. 5 at 77. Petitioner reported that she was attending PT several times a week and regularly following psychiatry. *Id.* She felt more stressed than usual, but her symptoms were "slightly improved," including her strength and balance. *Id.* Dr. Varrato opined that due to "the prolonged nature of her symptoms, an acute [SFN] perhaps on an autoimmune basis is also possible." *Id.* at 81. He recommended a skin biopsy to test for SFN and ordered additional labs. *Id.*

Petitioner's skin biopsy was completed on June 20, 2018, via an epidermal nerve fiber density ("ENFD") and sweat gland nerve fiber density test ("SGNFD") of her left thigh and left calf. Pet'r's Ex. 5 at 213. Petitioner's left calf biopsy revealed normal ENFD results, while her left calf showed "significantly reduced [ENFD], consistent with [SFN]." *Id.* Both of Petitioner's SGNFD tests were normal. *Id.* at 216. Petitioner returned to Dr. Varrato to discuss the results of her biopsy on July 25, 2018, where she reported improvements in strength and balance but no other symptom changes. *Id.* at 103. Dr. Varrato opined that Petitioner's biopsy results were "consistent with a non-length dependent [SFN]." *Id.* He further opined that there was "[n]o clear etiology at present" and that Petitioner's "idiopathic [SFN] was likely triggered on an autoimmune basis." *Id.* at 106. He ordered labs to test for antibodies associated with SFN and made a note to consider autonomic testing if Petitioner did not continue to improve. *Id.* at 107.

On August 15, 2018, neurologist Lucas Margolies performed an independent medical examination of Petitioner as part of her workers' compensation case. Pet'r's Ex. 14-6 at 167. Petitioner reported to Dr. Margolies that she began to experience numbness and tingling on the left side of her face "days" after she received the flu vaccine, and about six days after the vaccination the symptom began permanent, as well as involving her arms, hands, and legs. *Id.* Petitioner explained that she had contacted several of her colleagues, who "told her that her symptoms were in her head and possibly stress related." *Id.* She stated that she then developed "sandbag legs," and was worried she developed GBS, prompting her visit to the ED. *Id.* Petitioner reported that "[s]he was told that her [GBS] triggered a small fiber polyneuropathy and that [GBS] is different in everyone. . . . She was told [] that her small fiber polyneuropathy is autoimmune related and w[ould] likely progress over time." *Id.* at 168. Dr. Margolies then provided the following note:

> When I asked [Petitioner] whether or not [GBS] was a monophasic event, she reported that it was, however, that it triggered a [SFN], which could over time get worse. At the same time, however, she reported that [GBS] manifested itself as a [SFN]. She did not have an understanding between the difference in function

> between small and large fibers. She reported that there is no dispute at all that she had [GBS] and that the skin biopsy was just used to find the type of [GBS] that she had.

*Id.* Petitioner further reported numbness and tingling in her hands and feet constantly. *Id.* Petitioner reported that she never had any weakness in her arms or hands, but she did have weakness in her legs with imbalance. *Id.* On examination Dr. Margolies stated that her strength and senses were normal in her arms and legs, and her coordination was normal. *Id.* at 170. Dr. Margolies' impression was that Petitioner's symptoms following vaccination were "purely subjection sensory symptoms," and that her physical examinations had "been documented as essentially normal," with "absolutely no evidence of a central or peripheral nervous system disorder." *Id.* at 172. Dr. Margolies stated that weakness and imbalance would require large fiber involvement, which Petitioner did not have, as SFN could not cause these symptoms. *Id.* Dr. Margolies stated that GBS does not trigger other types of neuropathy, and "if indeed she has a [SFN], it would be unrelated to [GBS] and would not progress over time." *Id.* He was "not sure what to make of her skin biopsies," which showed the presence of SFN, and opined that "individuals with thyroid disease can have various forms of neuropathy including [SFN]." *Id.* at 172–73. Dr. Margolies then provided the following conclusion:

> In summary, there is no evidence that [Petitioner] has, or ever had [GBS] or any polyneuropathy. I do not think she has had any complications from her flu shot on October 6, 2017. Her examination today is completely normal and she is fully cleared to return to any type of work without restriction.

*Id.* at 173.

Petitioner also completed an independent psychiatric examination with Barbara Ziv as part of her workers' compensation case on August 17, 2018. Pet'r's Ex. 14-2 at 177. Petitioner stated that she received her flu vaccine on Friday, October 6, 2017, and that by the following Monday she began to experience "tapping" on the left side of her face, which continued for three days. *Id.* at 179. By Thursday, October 12, 2017, the feeling stayed, and on her drive home from work that evening "both arms and both hands got pins and needles." *Id.* Petitioner stated that she had been "under a lot of stress for the last three/four months" because of potential pay cuts, and thought her symptoms might be related. *Id.* Her symptoms continued throughout the rest of the day, eventually involving her legs and feet, at which point she suspected GBS due to her prior encounter with a GBS patient at work. *Id.* at 180. She then called a colleague, who she stated agreed she may have GBS. *Id.* After failing to sleep for most of the night, Petitioner drove herself to work, where employee health recommended she visit the ED. *Id.* Petitioner described her current symptoms as lacking balance, though it was improving, and that she walked "methodically." *Id.* at 181. Petitioner also reported ongoing fatigue in the afternoons and "[o]nce or twice a week [] experience[d] total body pain." *Id.* at 181–82.

In her assessment, Dr. Ziv stated that Petitioner's profile was "unlikely to provide much useful information about [Petitioner] because she was too guarded to cooperate in the self-appraisal." Pet'r's Ex. 14-2 at 185. Dr. Ziv attributed her primary symptoms to "somatic reactivity under stress" and opined that "[s]he may be manifesting fatigue, vague pain, weakness, or unexplained periods of dizziness. She may view herself as highly virtuous and she may exhibit a

'Pollyannish' attitude toward life." *Id.* Dr. Ziv opined that Petitioner "indicate[d] an interest in portraying herself as being physically disabled. . . . This is most likely the result of a long-term, chronic pattern of somatization that stems from basic ingrained personality problems," and noted that Petitioner's physical symptoms increased "when she face[d] life conflicts." *Id.* at 186. Dr. Ziv acknowledged that the issues of Petitioner's potential GBS and SFN diagnoses were "beyond [her] expertise," she stated that "no physician has been able to explain [Petitioner's] changing symptoms or the disparity between the severity of her complaints and her physical examination." *Id.* at 213. Dr. Ziv ultimately opined that "conversion disorder, somatization disorder[,] and factitious disorder are all possible contributors to [Petitioner's] overall presentation." *Id.* at 215.

Petitioner followed up with Dr. Varrato on November 29, 2018, for her "sensory [GBS]/autoimmune [SFN]." Pet'r's Ex. 5 at 123. Dr. Varrato noted that in October, "around the anniversary of her symptoms beginning, she developed increased pain and anxiety." *Id.* Petitioner was now back to baseline and overall reported less pain and improved fatigue with continued numbness and tingling in her feet. *Id.* Dr. Varrato opined that Petitioner's "idiopathic [SFN] was likely triggered on an autoimmune basis." *Id.* at 127. He noted that Petitioner's symptoms were improving, but that if she stopped improving he would order antibody tests for TS-HDS and FGFR-3. *Id.*

Petitioner continued to follow with Dr. Varrato and her PT throughout early 2019, and Dr. Varrato observed that Petitioner seemed to be slowly improving with her symptoms. Pet'r's Ex. 5 at 142–46; Pet'r's Ex. 12 at 42–48, 80–85. During a PT session on April 1, 2019, Petitioner reported that her symptoms were worsening as she recovered from a flu infection the week prior. Pet'r's Ex. 12 at 42.

Petitioner testified at her workers' compensation hearing on March 27, 2019, and stated that she was unable to return to her prior job as a NP due to the long hours and lack of breaks, as "[e]verything [she] do[es] is limited because [] if [she] sit[s] here, eventually, [she is] just going to start getting numb and pins and needles is going to come so bad." Pet'r's Ex. 14-5 at 574. Petitioner explained that due to her symptoms she could only work in short stints before needing a break, and her prior position was not conducive to her needs. *Id.* at 575. Petitioner testified that she initially had significant trouble walking, though now she was improving after working on a treadmill through her PT. *Id.* at 583. Petitioner was asked about her lack of a noticeable limp during her workers' compensation surveillance, at which point she answered that she was "probably" limping, but she thought "it was improving at that point. It was not as bad." *Id.* at 584.

Dr. Varrato testified at Petitioner's workers' compensation hearing on April 22, 2019. Pet'r's Ex. 14-6 at 385. He stated that upon Petitioner's initial presentation she had "tingling and burning paresthesias bilateral legs up to her thighs, . . . numbness in the hands and feet, toothache-like feeling in her legs, and she [felt] off balance." *Id.* Dr. Varrato opined that Petitioner's initial presentation fit with a sensory variant of GBS and he relied on a temporal association to Petitioner's flu vaccine to establish his opinion. *Id.* at 390–91. Dr. Varrato acknowledged that Petitioner's initial testing was mostly normal, and he testified that "[i]f the tests are done very early in the course of the illness, sometimes they'll be normal in both sensory variants of [GBS] as well as large fiber traditional, typical GBS." *Id.* at 396. Regarding Petitioner's SFN, Dr. Varrato testified that an SFN was "a little bit different" than GBS, though it was "still triggered in the same manner, autoimmune trigger, and triggered by the immunization itself potentially." *Id.* at 398. Dr.

Varrato disagreed with Dr. Margolies' interpretation of Petitioner's clinical history, testifying that "there are sensory variants of GBS that do not affect large fibers and that can be autoimmune-generated and cause a significant amount of discomfort, pain, and fatigue in patients." *Id.* at 401–02. On cross examination Dr. Varrato acknowledged that Hashimoto's disease can cause a sensory neuropathy, but it "does not typically cause abrupt onset of symptoms. It does not typically cause this degree of symptoms in the setting of normal thyroid functions." *Id.* at 405. Dr. Varrato also admitted that Petitioner did not have a typical presentation of GBS, which led him to conduct other tests to rule out central nervous system issues and other potential etiologies. *Id.* at 420. He stated that he differentiated her Hashimoto's disease from the flu shot in determining the cause of her symptoms by looking at "her original presentation, the timing of the flu shot, the rapidity of her symptoms starting, the manner in which they progressed, and the fact that they didn't improve, which ma[de him] look for something that wasn't there." *Id.* at 422. Dr. Varrato further explained that his note of an "idiopathic" SFN that was "triggered on an autoimmune basis" was meant to be in reference "to the fact that she had had a flu vaccination several . . . days prior." *Id.* at 424–25. Dr. Varrato's ultimate opinion was that "the vaccination triggered an autoimmune response sensory variant of GBS and a [SFN]." *Id.* at 428.

Dr. Margolies testified at Petitioner's workers' compensation hearing on May 15, 2019. Pet'r's Ex. 14-6 at 91. He testified that it was "unusual" for Petitioner to develop GBS in "that short a period of time," as "it takes the immune system typically weeks to months to rev up to cause either T cells or antibodies to be formed to attack the nerves." *Id.* at 96. He acknowledged that GBS was normally preceded by an infection, but Dr. Margolies would "completely ignore" the presence of an illness if it was "a few days ago or a week or two ago." *Id.* at 97. Dr. Margolies admitted that there was an association between GBS and the flu vaccine during the 1976 swine flu campaign, but otherwise noted the association was "highly controversial." *Id.* at 99. He expressed his confusion with Petitioner's characterization of her symptoms as "a [SFN] triggered by [GBS], [because] by definition [GBS] is a monophasic event." *Id.* at 100–01. He noted that Petitioner's symptoms were "sporadic" and affected her head, arms, and legs, but not her trunk. *Id.* at 101. Dr. Margolies also explained that SFN affects pain and temperature senses, but does not affect touch and proprioception, so Petitioner's SFN diagnosis would not explain all of her symptoms. *Id.* at 102. "It is true that if someone has a [SFN] technically their EMG can be normal. However, they cannot have weakness or imbalance." *Id.* He also testified that Petitioner's reports of fatigue and cognitive deficits were not consistent with GBS. *Id.* at 107. He opined that Petitioner's Hashimoto's disease would explain the findings from her skin biopsy or that Petitioner could "have a smoldering [SFN], which is essentially asymptomatic." *Id.* at 109. Dr. Margolies testified that Petitioner had a normal examination during his examination and that Petitioner's give-away weakness "sort of suggests that someone is either faking their condition or exaggerating or elaborating." *Id.* at 114. He further testified that none of his patients with SFN "have any restrictions at all in anything they can do." *Id.* at 115. Dr. Margolies explained that an "idiopathic" disease means that "we don't know what causes it. [He] would never use[] the term idiopathic when [he] knew the cause." *Id.* at 117.

On May 30, 2019, Petitioner returned to Dr. Varrato for a follow-up visit. Pet'r's Ex. 5 at 163. In her chart, Dr. Varrato listed her diagnosis as "sensory [GBS]/post[-]vaccination autoimmune [SFN]." *Id.* Petitioner reported feeling "overall [] about the same" since her last visit and was having difficulty with pain in her feet and her fatigue had improved. *Id.* Petitioner also reported "bouts of tachycardia," which had led cardiology to give her a Holter monitor. *Id.* She

had one episode of syncope and Dr. Varrato noted it was "[u]nclear if related to anxiety." *Id.* Dr. Varrato noted Petitioner's examination showed her condition was stable on her current medication and informed Petitioner she could reduce her gabapentin to see how she felt. *Id.* at 167. Petitioner attended PT on July 11, 2019, where she reported her symptoms were improving and that she was building strength. Pet'r's Ex. 6 at 216.

On October 18, 2019, Petitioner returned to Dr. Varrato for a follow-up visit. Pet'r's Ex. 53 at 40. Petitioner reported feeling "improved overall" and that she had stopped going to PT regularly, reduced her gabapentin, and stopped her amitriptyline. *Id.* She reported continued difficulties with pain in her feet with reduced medication but was "[s]till much better than [] before." *Id.* Dr. Varrato noted that she "continue[d] to slowly improve in terms of neuropathy discomfort" and that she may continue to experience mild forms of neuropathic pain, though he was "encouraged by her improvement the last [five] months." *Id.* at 44.

No further medical records were filed.

## III. Petitioner's Affidavit, Testimony, and Dr. Varrato's Letter

### A. Petitioner's Affidavit

On June 22, 2020, Petitioner filed an affidavit. Pet'r's Ex. 2. Petitioner stated that she received the subject flu vaccine on October 6, 2017, at the Lehigh Valley Health Network Employee Health Services. *Id.* at ¶ 2. Petitioner then "developed [GBS] and [SFN] which was caused by the flu vaccine." *Id.* at ¶ 3. Petitioner stated that in the three years prior to vaccination she had occasional appointments with the Doylestown Women's Health Center, but did not regularly see a primary care physician ("PCP") due to her job as an NP, where she "typically relied on colleagues for medical advice." *Id.* at ¶ 6.

### B. Petitioner's Testimony

Petitioner testified at the entitlement hearing held on March 19, 2025. Tr. 11. Petitioner stated that prior to her flu vaccine she had been diagnosed with Hashimoto's disease in 1993, and she had followed with the care of endocrinologist Jay Springer for her treatment. Tr. 14–15. Petitioner was on the medication Synthroid for the management of her Hashimoto's disease and described it as "controlled." Tr. 16. She did not have a PCP, but due to her work as a NP, other nurses and doctors "helped each other out," to include labs and antibiotics. Tr. 17.

Regarding her October 6, 2017 flu vaccine, Petitioner testified that she waited until "the last minute" due to her busy schedule. Tr. 17. After the flu vaccine, she had "the typical sore arm" the following two days, but her symptoms worsened on the following Monday, October 9, 2017. Tr. 18. Petitioner stated that as she was preparing to see her first patient when "all of a sudden [she] felt a tapping in [her] face . . . and it was kind of weird, and [she] kind of shrugged it off." Tr. 19. At that time, Petitioner felt it may be related to a cervical issue in her neck, and the tapping sensation lasted for 20 to 30 minutes before it ceased for the rest of the day. *Id.* Petitioner experienced the same sensation the following Tuesday and Wednesday, each for short intervals, prompting Petitioner to tell a colleague that "[her] neck must be out, because [she was] getting these weird sensations." *Id.*

By Thursday, October 12, 2017, the "tapping" sensation returned and lasted for the entire day. Tr. 19. As Petitioner was driving home, she was "sitting there at the red light, and as [she was] sitting there, it's like someone just flicked a switch." Tr. 20. She testified that her arms and hands "just went completely numb, pins and needles, tingly," and she became worried she may be having a stroke or an issue with her cervical spine. *Id.* Petitioner continued to drive home and told her husband she may have an issue with her neck. *Id.* After finishing dinner, Petitioner stated that as she stood up "it was like someone flicked a switch. [Her] legs now and [her] feet did the same thing" as her arms. *Id.* Petitioner stated she then remembered her prior flu shot and became concerned she was developing GBS, which prompted her to call a colleague for their opinion. Tr. 21. Petitioner testified that her colleague told her "it's very rare, and, no, I think, you know -- they just didn't believe that that's what it could be, and they told me basically to go to bed." *Id.* When Petitioner woke up in the morning to get ready for work, she stated she had "sandbag legs . . . they were becoming very heavy." Tr. 22. It was at this point Petitioner testified that she "really believed [she] had [GBS]." *Id.* Petitioner then drove herself to the ED and asked for a neurology consultation. Tr. 23. Petitioner stated that she saw Dr. Clauser, who told her before any tests were completed that the "[t]iming of the flu shot and the fact that [her] Achilles tendon reflexes were absent, he says, [w]e can state at this point you are experiencing symptoms of [GBS]." Tr. 25. Dr. Clauser offered Petitioner five days of in-patient IVIG treatment, which she accepted. *Id.* Petitioner stated that her symptoms did not improve following her IVIG treatment. Tr. 27. Petitioner also completed PT during her hospitalization, and Petitioner testified that during her encounter her legs felt weak and her "left leg felt like it was turned. It felt like [her] kneecap was like bent, facing sideways, even though it wasn't." *Id.*

Petitioner testified at the time of her discharge she was told to call if she felt "any sensations or anything that's abnormal." Tr. 29. A few days following her discharge, while standing in the kitchen, she began to experience "pins and needles and the tingling," which she described as "exacerbated." *Id.* This prompted her to call Dr. Mackin, who advised her to go to the ED if she had difficulty breathing or if she could not walk. Tr. 30. Petitioner also testified that she was unaware that a VAERS report had been filed on her behalf. *Id.* She stated that PA Remmel later prescribed her with gabapentin to ease her symptoms. Tr. 32. Petitioner's symptoms continued through to her initial PT evaluation in December 2017, where she stated that she had weakness in her legs and that "the balance was just off." *Id.* at 34. Petitioner reported falling twice before this visit because she could not "feel [her] feet making contact with the ground." *Id.*

Petitioner began seeing Dr. Varrato on January 11, 2018, at which point she "started having achiness, like toothache pain, throbbing in [her] legs." Tr. 37–38. After Petitioner's repeat EMG came back normal, Dr. Varrato ordered an MRI to "make sure there was nothing going on, instead of a peripheral standpoint, more of a central nervous system standpoint." Tr. 40. Petitioner then increased her gabapentin dosage due to her worsening symptoms, "like bee stings, very prickly and tingly." Tr. 41. By May 23, 2018, Petitioner's symptoms had not improved and Dr. Varrato recommended a skin biopsy be performed. Tr. 47. Petitioner stated that Dr. Varrato's reasoning was "to see if this [was] an autoimmune-in-nature neuropathy, something that [GBS] -- it kind of stemmed from the [GBS], like something that was caused from that, if you will." *Id.* When Petitioner returned to discuss her biopsy results, Dr. Varrato told her there was a positive result for "small fiber cell neuropathy . . . and he sa[id i]t's autoimmune in nature." Tr. 48. Petitioner stated that Dr. Varrato described her SFN as "a residual side effect or like a -- the type of neuropathy that

the [GBS] had given [her], that when [she] had gotten [GBS], . . . this is what it caused. It kind of triggered the autoimmune type of neuropathy in [her] that [she] ha[s]." *Id.* At this point Dr. Varrato gave Petitioner "the green light" to reduce her gabapentin, which caused her to feel "like yellowjackets were stinging [her]." Tr. 49.

Petitioner attended her final PT session in July 2019, and she explained that she "got significantly stronger" in her legs. Tr. 54. She similarly reported improved symptoms to Dr. Varrato, but Petitioner testified that her symptoms of numbness, tingling, and burning remained. Tr. 55–56, 59. She explained that various factors affected her symptoms, including the temperature, her menstrual cycle, stress, or illness. Tr. 56. She also reported "body-wide pain that comes from the shoulders down," which occurred about once a month. Tr. 57. Throughout the course of her treatment Petitioner continued to see Dr. Varrato for management of her symptoms and medication, as he increased her dosage up to 1,800mg of gabapentin by the time of the entitlement hearing. Tr. 58. Petitioner also testified that Dr. Varrato had told her that "it's contraindicated for [her] to get the flu shot." Tr. 64.

### C. Dr. Varrato's Letter

On April 13, 2023, Petitioner filed a letter written by Dr. Varrato. Pet'r's Ex. 29. Dr. Varrato stated that he had been seeing Petitioner since January 2018 "for symptoms suggestive of [GBS] or [SFN]. *Id.* He stated her symptoms began in October 2017, five days before her hospital admission, and about "[two-to-three] days after [her] flu shot." *Id.* Dr. Varrato had followed Petitioner since January 2018 "with extensive testing and nerve biopsy, she was eventually diagnosed with non length dependent [SFN]." *Id.* "After extensive testing and evaluation [Dr. Varrato] concluded the [SFN] was autoimmune in etiology." Due to the temporal relationship between Petitioner's vaccine and the onset of her symptoms, Dr. Varrato stated that "it is my professional opinion that [Petitioner] has variant sensory GBS/post[-]vaccination [SFN] due to the flu vaccine." *Id.*

## IV. Workers' Compensation Claim

Petitioner filed a copy of her November 4, 2019 workers' compensation decision in support of her petition. Pet'r's Ex. 14-7 at 126. The judge presiding over Petitioner's workers' compensation case, Robert Benischeck, made the following findings of fact: (1) that Petitioner was credible and adopted her testimony as fact; (2) that Petitioner "sustained a sensory variant of [GBS] from the required flu vaccine[;]" (3) that the testimony of Dr. Varrato was credible and the testimony of Dr. Margolies and Dr. Ziv was not credible; (4) that Petitioner was not capable of returning to work at the time of her job offer letters; and (5) that Petitioner suffered from a moderate major depressive episode and anxiety disorder as a result of her injury. *Id.* at 126–28. The decision also provided the following reasoning for the adoption of Petitioner's testimony:

> [Petitioner's] credibility is bolstered by her candid admission of improvement. There is little financial incentive for [Petitioner] to malinger given her high average weekly wage compared to her total disability rate. There is some variability between some complaints and some clinical examinations, but overall this Judge finds her complaints of sensory changes in her extremities to be quite consistent and supported by the treating doctors. As noted below, there are numerous

> examples where such complaints were corroborated by the medical clinicians and the skin biopsy.

*Id.* at 126. Judge Benischeck also provided the following reasoning for dismissing the opinions of Dr. Margolies and Dr. Ziv:

> Employer's experts stress that the complaints of weakness, fatigue, forgetfulness, confusion, and imbalance are not typical of [GBS]. However, these seem to have always been the secondary symptoms in comparison to her primary complaints of sensory changes in her hands and feet which are the typical signs of a [SFN]. Moreover, the complaints of confusion and fatigue have already largely improved or subsided, again suggesting that they were not the primary problem. Also, the Employer's experts did not consider other explanations for the cognitive problems such as the side effects of the medications or her anxiety, as noted by Dr. Wiley. Finally, Claimant logically explained that the imbalance was largely due to the inability [to] feel her feet when she walked. In short, this Judge is not persuaded that the presence of the fatigue, confusion and imbalance disproves the presence of a sensory variant of [GBS].

*Id.* at 127.

## V. Experts

### A. Expert Qualifications

#### 1. Petitioner's Expert, Dr. Noah Kolb, M.D.

Dr. Kolb is a board-certified neurologist who currently serves as an Associate Professor of Neurology at the University of Vermont Medical center, with a specialty in neuromuscular diseases. Pet'r's Ex. 16 at 1; Pet'r's Ex. 25 at 1. Dr. Kolb received his M.D. from the University of Massachusetts Medical School, and he completed his neurology residency at the University of Virginia Health System before completing a neurology fellowship at the University of Utah. Pet'r's Ex. 16 at 1. Dr. Kolb has been board certified to perform EMG/NCS studies and has been trained to performed skin biopsies for SFN. Pet'r's Ex. 25 at 1. He currently teaches "medical students, residents[,] and fellows about the diagnosis and management of neuropathy in addition to conducting and publishing clinical research on neuropathy." *Id.*

#### 2. Respondent's Expert, Dr. Brian Callaghan, M.D.

Dr. Callaghan is a board-certified neurologist who currently serves as an Associate Professor of Neurology at the University of Michigan, "with a primary interest in patients with neuropathy including [SFN] and GBS." Resp't's Ex. A at 1. Dr. Callaghan received his M.D. from the University of Pennsylvania Medical Center, where he also completed his medical internship and neurology residency. Resp't's Ex. B at 1. He also completed a neuromuscular fellowship at the University of Michigan Health System. *Id.* Dr. Callaghan has published "more than 120 articles with most focusing on neuropathy[,] including the appropriate diagnostic evaluation and

treatment." Resp't's Ex. A at 1. In his clinical practice, he "encounter[s] and treat[s] approximately 100 patients with [SFN] each year and more than [50] patients with GBS in the last 10 years." *Id.*

### 3. Respondent's Expert, Dr. Chenthamarakshan Vasu, Ph.D.

Dr. Vasu is a professor of Microbiology and Immunology within the College of Medicine at the Medical University of South Carolina. Resp't's Ex. C at 1. Dr. Vasu earned his B.S. and M.S. in Zoology from the University of Calicut in India, before receiving his Ph.D. in Biochemistry/Immunology from Nagpur University in India. Resp't's Ex. D at 1. He also completed post-doctoral fellowships at the Department of Medical Microbiology at the University of Malaya in Malaysia and the Department of Surgery and Microbiology & Immunology at the University of Illinois at Chicago. *Id.* Dr. Vasu has been "involved in Immunology research, addressing various clinically relevant problems, for the last 33 years." Resp't's Ex. C at 1. His research as focused on the roles of pathogens and commensal microbes in diseases such as type 1 diabetes, systemic lupus erythematosus, and colitis, the mechanisms of autoimmune disease progression, and the development of therapies to treat these diseases. *Id.* at 2. Dr. Vasu has also served as an "ad-hoc reviewer for several biomedical science journals" and he has not provided an expert opinion or testified in medico-legal matters prior to this case. *Id.*

## B. Expert Reports and Testimony

### 1. Reports and Testimony of Dr. Kolb

#### a. Dr. Kolb's Initial Report

Dr. Kolb began the discussion of his initial report with an explanation of SFN, describing it as "a syndromic disorder of thinly myelinated A-delta and unmyelinated C fibers mostly characterized by neuropathic pain . . . and autonomic symptoms." Pet'r's Ex. 15 at 6 (citing Pet'r's Ex. 21).[8] Gemignani et al. explained that SFN "can be diagnosed when the presence of consistent symptoms and signs is corroborated by special confirmatory tests to demonstrate small fiber impairment, namely skin biopsy for quantification of [ENFD] and quantitative sensory testing." Pet'r's Ex. 21 at 1. Dr. Kolb further stated that "[c]lear cases of acute onset [SFN] presenting as [GBS] have been documented elsewhere in the literature as well," and thus "SFN may therefore represent part of the GBS spectrum." Pet'r's Ex. 15 at 6.

"Separately from a GBS type presentation, there is clear evidence that '[o]ther immune-mediated conditions occasionally presenting as [non-length dependent]-SFN include[] SFN following vaccination.'" Pet'r's Ex. 15 at 6.[9] Dr. Kolb acknowledged that "there is much that is unknown" about these presentations, but that "a causal association is presumed based on the temporal relationship between the vaccination and symptoms onset and the exclusion of more common causes of [SFN]." *Id.* (quoting Pet'r's Ex. 17).[10] Dr. Kolb opined that this presentation matched that of Petitioner, explaining that "[w]hether we label it small fiber GBS or acute onset

---

[8] Franco Gemignani et al., *Non-Length-Dependent Small Fiber Neuropathy: Not a Matter of Stockings and Gloves*, 65 MUSCLE & NERVE 10 (2022).
[9] Dr. Kolb did not provide a reference or cite for the internal quotations.
[10] Nizar Souayah et al., *Small Fiber Neuropathy Following Vaccination for Rabies, Varicella or Lyme Disease*, 27 VACCINE 7322 (2009).

[SFN] in response to a stimulus (vaccine) is medically immaterial and a matter of semantics as there is expert consensus that [non-length dependent]-SFN can occur after vaccination." *Id.* (citing Pet'r's Ex. 21).

Turning to the *Althen* prongs, Dr. Kolb listed several potential theories for the cause of Petitioner's injury, stating that "[v]accines that contain antigens from infectious agents might induce autoimmunity by similar mechanisms such as molecular mimicry, epitope spreading, bystander activation, and polyclonal activation." Pet'r's Ex. 15 at 6 (citing Pet'r's Ex. 19).[11] He further explained that vaccines contain adjuvants "designed to stimulate the immune system without being an antigen themselves," which "increase the response of the immune system to [the] antigen." *Id.* at 6–7. "It has thus been suggested the homology between the human proteome and the adjuvanted-vaccine in a genetically susceptible host may increase the possibility of the induction of cross-reactive immune response that lead to [autoimmune diseases]." *Id.* at 7 (citing Pet'r's Ex. 22).[12] Dr. Kolb further explained molecular mimicry, stating that "the foreign peptide causes an activation of T or B cells which then subsequently attacks the peptides of the body itself." *Id.* (citing Pet'r's Ex. 22). He pointed to "[c]lassic GBS after the flu vaccine" as an example of this, where "the epitope of the flu vaccine shares similar epitopes to the myelin sheath of the peripheral nerve axons." *Id.* (citing Pet'r's Ex. 22). He then cited to several articles explaining the 1976 H1N1 flu vaccine association with GBS. *Id.* (citing Pet'r's Ex. 20;[13] Pet'r's Ex. 22; Pet'r's Ex. 24).[14] Dr. Kolb opined that the relationship between the vaccine and SFN was likely "multifactorial using multiple of these mechanisms." *Id.* He cited to case reports to support this claim, which "concluded that multiple pathologic processes have been proposed including immune mediated hypersensitivity to solvents/adjuvant," and noted this mechanism was proposed for a case of SFN following COVID-19 vaccination. *Id.* (internal quotations omitted) (citing Pet'r's Ex. 23;[15] Pet'r's Ex. 25).[16] Dr. Kolb opined that "the medically causal relationship at this point can be inferred by the 'relative presence or absence of events, the temporal relationship between two events, the consistency and strength of adverse event reports and the biological plausibility of such a link.'" *Id.* (quoting Pet'r's Ex. 19 at 1).

Regarding *Althen*'s second prong, requiring the showing of a logical sequence of cause and effect, Dr. Kolb opined that while most SFNs are "sub-acute to chronic, . . . [t]here are uncommon exceptions to this concept and one of those exceptions is the development of autoimmune [SFN] which can occur abruptly and after the inciting event (the vaccination)." Pet'r's Ex. 15 at 7. He opined that the development of SFN symptoms "in a patient with no previous[] neurologic problems and minimal neuropathy risk factors[] within two days of receiving the flu vaccine is strongly supportive of the theory that the vaccine caused the [SFN]." *Id.*

---

[11] Nancy Agmon-Levin et al., *Vaccines and Autoimmunity*, 5 NATURE 648 (2009).
[12] Manuel Rojas et al., *Molecular Mimicry and Autoimmunity*, 95 J. AUTOIMMUNITY 100 (2018).
[13] Tamar Lasky et al., *The Guillain-Barré Syndrome and the 1992-1993 and 1993-1994 Influenza Vaccines*, 339 N. E. J. MED. 1797 (1998).
[14] Lawrence B. Schonberger et al., *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976-1977*, 110 AM. J. EPIDEMIOLOGY 105 (1979).
[15] Jafar Kafaie et al., *Small Fiber Neuropathy Following Vaccination*, 18 J. CLINICAL NEUROMUSCULAR DISEASE 37 (2016).
[16] Waqar Waheed et al., *Post COVID-19 Vaccine Small Fiber Neuropathy*, 64 MUSCLE & NERVE E1 (2021).

Turning to the third *Althen* prong, requiring the showing of a proximate temporal relationship, Dr. Kolb stated that "[t]he development of [SFN] approximately [two] days after the flu vaccine in a patient with no previous[] neurologic problems demonstrates a clear temporal relationship between the two." Pet'r's Ex. 15 at 8. He argued that "the rapidity of the development of the symptoms" was further evidence of vaccine causation as "most [SFN] that occurs idiopathically, or without a clear inciting event takes months to develop." *Id.* Dr. Kolb cited to Schonberger et al., which he stated found "multiple cases in both the 0-1 and 1-3 day period following vaccination" for GBS. *Id.* (citing Pet'r's Ex. 24). He also stated that the COVID-19 pandemic was a "common sense example," as "it should be no surprise that the immune system is activated within 24 hours after vaccination as this is the time period in which many of us experienced symptoms after [COVID]-19 vaccination." *Id.*

**b. Dr. Kolb's Supplemental Report**

In his first supplemental report, Dr. Kolb acknowledged that Petitioner did not meet the diagnostic criteria for SFN as outlined by Devigili et al.[17] Pet'r's Ex. 26 at 2 (citing Resp't's Ex. A, Tab 3). He explained that "[t]here are times when individual patients may not fully fulfill a set of diagnostic criteria but still have clear evidence of a disease. This is one of those cases." *Id.* Dr. Kolb argued that according to the authors in Devigili et al., "patients can be diagnosed with SFN when at least two of the three criteria are demonstrated on examination. All three are not required." *Id.* According to Dr. Kolb, Petitioner satisfied the first criterion, requiring "clinical signs of small fiber impairment." *Id.* Petitioner did not satisfy the second criterion for quantitative sensory testing ("QST") testing, as this was not performed, but Petitioner did satisfy the third criterion, requiring evidence of "reduced [intra] ENF density [("IENFD")] at the distal leg," as evidenced by her skin biopsy. *Id.* The authors expanded on the significance of the skin biopsy, stating that "[r]educed epidermal innervation density has been used as a mandatory criteria for diagnosing SFN," though it can be normal in approximately 10% of patients who meet the other two criteria. Resp't's Ex. A, Tab 3 at 1. Dr. Kolb further argued that "the pattern of low IENFD in the thigh with normal distal leg IENFD is well described in the literature in non-length dependent [SFN]." Pet'r's Ex. 26 at 2. He cited to Gorson et al., where the authors found that 65% of non-length dependent SFN patients had "reduced IENFD in the thigh equal to or more prominent than the calf in 15 patients." *Id.* (citing Pet'r's Ex. 28).[18] Dr. Kolb argued that an analysis of the tables in the Gorson et al. article revealed that seven of the 23 patients also had "reduced thigh IENFD in the thigh and normal IENFD in the distal leg, the same pattern that was seen in [Petitioner's] case." *Id.* (citing Pet'r's Ex. 28). He also argued that one of the case studies, which involved a case of acute onset SFN following flu vaccination, was consistent with the case of Petitioner, involving

> (1) Bilateral distribution with early and prominent involvement of proximal regions, especially the face and tongue or the hands before or simultaneously with he legs and feet in a non-length dependent distribution (2) relative sparing of the large fib[er]s (3) skin biopsy specimens corroborating a non-length dependent pattern of IEND loss in proximal sites of the thigh or forearm, sparing the calf (4)

[17] Grazia Devigili et al., *Diagnostic Criteria for Small Fibre Neuropathy in Clinical Practice and Research*, 142 BRAIN 3728 (2019).
[18] K.C. Gorson et al., *Non-Length Dependent Small Fibre Neuropathy/Ganglionopathy*, 79 J. NEUROLOGY, NEUROSURGERY & PSYCHIATRY 163 (2008).

> a slowly progressive course . . . the distribution can be symmetrical or asymmetrical.

*Id.* (citing Pet'r's Ex. 28). He noted that while Petitioner's presentation was more acute than that in the case study, he opined this was "because of the rapidity of her immune response to the vaccine." *Id.* at 2–3.

Dr. Kolb also acknowledged that Petitioner met two of the exclusion criteria for an SFN diagnosis as outlined by Devigili et al., being that Petitioner displayed signs of large fiber and motor fiber impairment. Pet'r's Ex. 26 at 3. However, Dr. Kolb argued that these criteria are more important in research settings and that "they are required for a formal diagnosis of pure [SFN;]" but, "[i]n this case the fact that there could be other fiber involvement or other neurologic issues superimposed on the [SFN] is immaterial." *Id.* Rather, Dr. Kolb argued that patients are "often diagnosed with mixed small and large fiber polyneuropathies or [SFN] in addition to other neurologic issues." *Id.*

Dr. Kolb also agreed that Petitioner did not have sensory GBS given her normal EMGs, but explained that "much of the confusion from her clinical notes is that her doctors are not necessarily always making a clear clinical distinction between sensory GBS and non-length dependent [SFN]." Pet'r's Ex. 26 at 3. He noted that this analysis is supported by Dr. Varrato's ultimate opinion that Petitioner suffered from SFN attributable to the flu vaccine. *Id.*

**c. Dr. Kolb's Testimony**

Dr. Kolb testified at Petitioner's entitlement hearing on March 19, 2025. Tr. 74. He provided his ultimate opinion that Petitioner "had [SFN] caused by the vaccine." Tr. 83. Dr. Kolb then turned to explaining the difference between small and large fiber neuropathies, with "the large fibers being the ones that kind of start back in your spinal cord . . . the small fibers predominantly being the ones we think about in the skin." *Id.* He noted that while "some things cause just one or the other[, m]any things actually cause both, and sometimes the symptoms are different. Often the symptoms and the signs are different between the two." *Id.* He explained that small fibers regulate pain, temperature, and autonomic functions, while large fibers are responsible for sensation and strength. Tr. 84. EMGs are conducted to measure the function of large fiber nerves and do not measure the function of small fibers. *Id.*

Dr. Kolb next addressed the specifics of SFN, explaining that length-dependent SFN "sort of [affects] the tips of your hand and your feet, so sort of like classic stocking distribution," while non-length dependent SFN "occurs when you have sensory loss or symptoms in another distribution, so that could be anywhere else," including the face, chest, or another part of the body. Tr. 85–86. He testified that while there was "some information about the exact pathophysiology of [SFN], [] there's also lots that we don't fully know." Tr. 88. Typical symptoms include numbness, a loss of temperature or pain sensation, prickling, stabbing pain, burning pain, itching, and pins and needles, as well as autonomic symptoms. Tr. 88–89. According to Dr. Kolb, SFN is typically diagnosed by clinical symptoms, negative EMG/NCS testing, and ENFD skin biopsy testing. Tr. 91–92. He addressed Devigili et al., which he explained differentiated between clinical practice and research criteria, "because we don't always use the same criteria for both of those things." Tr. 94. The article discussed two different sets of criteria, the Besta criteria and the

NEURODIAB criteria. *Id.* (citing Resp't's Ex. A, Tab 3). Under the Besta criteria, Dr. Kolb explained that you would need to meet at least two of the three inclusion criteria, being "clinical signs of small fiber impairment; abnormal warm or cool testing at the foot by QST . . . ; and [] reduced [ENFD] which you get by skin biopsy at the distal leg." *Id.* However, he continued by stating that these criteria are not accepted to make a diagnosis of non-length dependent SFN. Tr. 95. According to Dr. Kolb, this is because "[i]n non-length dependent [SFN], those changes might not hold, so it might be more abnormal in the thigh than it is in the foot, so that's why these Besta criteria wouldn't really fit for non-length dependent [SFN]." *Id.* "If we ignore the distal part of the IENFD, she has an abnormal IENFD, and she has clinical signs of small fiber impairment." Tr. 96. "The Besta criteria . . . they put this out there as a diagnostic criteria, but at least in, you known, the title and . . . the abstract, they don't specify it's only for length- or non-length-dependent [SFN]." *Id.* In his personal practice, Dr. Kolb testified that he would diagnose a patient with SFN based off of their clinical symptoms, negative nerve testing, and skin biopsy results. Tr. 98.

Specific to the skin biopsy, Dr. Kolb explained that the biopsy sample is "sen[t] off to the lab, gets stained with certain things, and they count these tiny little intraepidermal nerve fibers." Tr. 103. In Petitioner's case, Dr. Kolb testified that her levels were abnormal in her thigh and normal in her calf, "consistent with [SFN] for the thigh." Tr. 103–04. Interpreting Petitioner's results to the Besta criteria "to the letter of the law," Dr. Kolb acknowledged she would not meet a diagnosis of SFN because her distal leg skin biopsy of her calf was normal. Tr. 104. However, Dr. Kolb argued that he did not "think that those criteria reasonably apply to [SFN]." *Id.* In particular, he argued that "somebody who has sensory loss in essentially the entirety of their leg, the thigh [is] abnormal, but the distal leg is not," is a pattern seen in non-length dependent SFN cases. Tr. 104–05. To bolster this argument Dr. Kolb relied on Gorson et al., which reviewed the diagnostic findings of 20 patients with non-length dependent SFN. Tr. 105. (citing Pet'r's Ex. 28). "[I]n five of these cases . . . they ha[d] low [ENFD] at the thigh and normal in the calf . . . they ha[d] findings where they might be normal in the distal leg, even though they have sensory symptoms there, so [they are] similar to [this] case." Tr. 106. He also cited to Gendre et al.,[19] an article examining 20 cases of acute onset SFN, several of which were "middle-aged women who presented with a non-length dependent pattern of their neuropathy." Tr. 109 (citing Pet'r's Ex. 31). Three cases followed vaccination, including one following flu vaccination, and five cases showed reduced ENFD in the thigh but not the calf. *Id.* According to Dr. Kolb, these three articles "present very clear evidence that in non-length-dependent [SFN], that the [ENFD] findings are not length-dependent . . . that suggests that in diagnosing non-length-dependent [SFN], you can't really apply [] the last of the Besta criteria which specifies that it has to be abnormal in the calf." Tr. 111. On cross examination Dr. Kolb admitted that none of the patients in the Gorson et al. study experienced "limb weakness, impaired joint position, gait ataxia, or Romberg sign," but that Petitioner did. Tr. 171 (citing Pet'r's Ex. 28).

Dr. Kolb acknowledged that Petitioner met two of Besta's three exclusionary criteria given that she had weakness and sensory symptoms indicative of large fiber involvement on some of her examinations. Tr. 112. However, Dr. Kolb argued that Petitioner's consistently normal EMG studies were evidence that there was no large fiber involvement. *Id.* Nonetheless, Dr. Kolb admitted that "weakness cannot be attributed to [SFN]," though he speculated that Petitioner may have another underlying process that is causing those symptoms, such as pain or a pinched nerve.

[19] Thierry Gendre et al., *Characterizing Acute-Onset Small Fiber Neuropathy*, 11 NEUROLOGY: NEUROIMMUNOLOGY & NEUROINFLAMMATION 1 (2024).

Tr. 113. He added that the stringency of the Besta criteria were because they were developed for research purposes, where "it is absolutely critical that you find patients that fully fit into your inclusion criteria, and . . . only have that diagnosis you're talking about." Tr. 114. However, on cross examination, Dr. Kolb admitted that the title of the article was "Diagnostic criteria for [SFN] in clinical practice and research." Tr. 173. He later clarified that he would characterize Petitioner's symptoms of hypersensitivity, burning, "bee stabbing," and prickling as consistent with a diagnosis of SFN, while her symptoms of imbalance and gait difficulties would not be, "unless there's pain that's interfering." Tr. 197. Dr. Kolb was also asked about Petitioner's normal CSF levels from her lumbar puncture, and he explained that "within the first week of symptom onset, only 50 percent of people have elevated protein in their CSF." Tr. 200. He again reiterated that his diagnosis was not GBS, but rather "post-vaccination [SFN]," but that "in our highest quality journals now, they're publishing articles that are suggesting that exclusively [SFN] that presents acutely may be a variant of GBS." Tr. 201. On redirect examination, Dr. Kolb clarified that "the majority of symptoms" during Petitioner's first few months of progression were related to numbness, tingling, and prickling, and not weakness or gait imbalances. Tr. 206. He also pointed to Petitioner's neurology visit on November 7, 2017, when she reported paresthesia in her legs "up to her thighs" as supportive of her skin biopsy findings. Tr. 208. He also cited to Gemignani et al., which stated that "[d]iagnosis of non-length-dependent [SFN] can be problematic, varied and often atypical presentation, and the diagnostic criteria developed for distal [SFN] are not suitable for non-length-dependent [SFN]." Tr. 209 (citing Pet'r's Ex. 21).

When asked on cross examination to clarify his opinion regarding Petitioner's diagnosis, Dr. Kolb testified that he believed Petitioner had "post-vaccination [SFN]," but that "there is mounting evidence that . . . acute onset [SFN] could be a . . . form of sensory GBS, but [his ] expert opinion is that she has acute onset [SFN]." Tr. 155. Dr. Kolb also admitted that Petitioner's balance, weakness, and gait issues were likely not associated with her SFN, but that he was "not saying that [SFN] caused every single one of those symptoms she complained of. [He thought] that the overall picture is most consistent with [SFN]." Tr. 158. Dr. Kolb also admitted he did not have an explanation for Petitioner's weakness, balance, or gait issues unless they were related to her pain from her SFN. Tr. 159. When asked about Petitioner's "give-away weakness," Dr. Kolb agreed that this was when "the muscle is not actually weak, but the patient has reduced resistance." Tr. 160. He also agreed that Petitioner's sensory examinations were subjective. Tr. 161. I asked Dr. Kolb to clarify whether SFN was a diagnosis or a symptom of a condition, to which he responded by stating that SFN "is its own diagnosis," but that it can be caused by other diseases. Tr. 193. I also asked Dr. Kolb his opinion regarding Dr. Varrato's diagnosis of an "idiopathic [SFN] with [an] autoimmune trigger," which he acknowledged was contradictory. Tr. 195. Dr. Kolb explained that "maybe [Dr. Varrato] didn't know why the autoimmune process had started, but maybe he was meaning that as not having an underlying etiology for what triggered the autoimmune process perhaps." Tr. 196. Dr. Kolb also placed significant weight on the fact that Petitioner's diagnosis from Dr. Varrato was "either sensory GBS or post-vaccination [SFN]," which he argued indicated that Dr. Varrato never seriously considered Petitioner's Hashimoto's disease to be implicated in her disease process. *Id.*

Next, Dr. Kolb discussed his theory of causation, explaining that molecular mimicry is when "certain things in the body can look a lot like the proteins or the other components of a vaccine or of something else, and . . . antibodies are created, that are supposed to be protective, then go on to actually damage part of . . . the body, which is obviously not the intended cause." Tr.

122. He pointed to the relationship between the flu vaccine and the development of GBS in support of his theory, as well as the relationship between GBS and Campylobacter jejuni. *Id.* According to Dr. Kolb, specific antibodies, such as GM1 and GQ1b, are associated with different types of GBS and Miller Fisher syndrome, which can be tested for. Tr. 123. He then turned to discussing small fiber impairment in the setting of GBS, relying on Ghasemi & Rajabally.[20] Tr. 127 (citing Pet'r's Ex. 18). "[I]n some patients, there is evidence of small fiber nerve dysfunction, so they talk specifically about . . . neuropathic pain and allodynia, autonomic dysfunction, . . . [and] sensory testing." *Id.* In discussing the co-existence of SFN and other inflammatory neuropathies, the authors explained that while "large fibers represent the main target of the immunologic attack . . . there is some evidence confirming the coexisting involvement of small fibers in these disorders." Pet'r's Ex. 18 at 17. The authors also noted the existence of "acute-onset pure SFN as a variant of GBS." *Id.* They pointed to six case studies with "[SFN] preceded by infection and associated with CSF albumin-cytologic dissociation," and opined that "[a]cute presentation of SFN may therefore represent part of the GBS spectrum." *Id.*

Dr. Kolb also referred to Seneviratne & Gunasekera[21] in support of this classification. Tr. 129. There, the authors reviewed six case reports of acute SFN, four of which were preceded by infection, and all showed elevated CSF proteins and normal findings on NCS. Pet'r's Ex. 30 at 1. Due to these findings, the authors opined that acute SFN may be a variant of GBS. *Id.* The authors explained that the diagnostic criteria for sensory GBS included "acute onset symmetric sensory loss, progression up to [four] weeks, diminished or absent reflexes, normal muscle power, electrophysiological evidence of demyelination in at least two nerves, monophasic course, no alternative cause for neuropathy, no family history of neuropathy, and increased CSF protein (in some)." *Id.* at 2. In this study, the patients met seven of the nine criteria, with the exception of normal electrophysiological findings and brisk reflexes, suggesting "that the involved nerve fib[er] type could possibly be different." *Id.* Because all six patients "demonstrate[d] clinical features compatible with [SFN] . . . [t]hese six patients could perhaps be considered a subgroup of sensory [GBS], as they fulfill most of the diagnostic criteria." *Id.* at 3. "Small fib[er] involvement in [GBS] has been shown in a postmortem study, although not in isolation." *Id.*

Similarly, Dr. Kolb discussed Yuki et al.[22] and Uncini & Yuki.[23] Tr. 130–31. Yuki et al. was a case report of three patients with "severe pain in the extremities weeks after a preceding infectious illness." Pet'r's Ex. 41 at 1. These patients' symptoms progressed and they "developed decreased reflexes, autonomic symptoms, and impaired sensation in a glove-and-stocking distribution." *Id.* The authors explained that the patients exhibited reduced ENFD consistent with SFN, but that their "reduced tendon reflexes were likely a result of the spinal root inflammation common to [GBS] and its variants." *Id.* at 4. The authors acknowledged that while GBS traditionally affects large nerve fibers, their findings "suggest that an acute immune response can be directed against small fibers and exhibit similarities to [GBS]," including preceding illness, a

---

[20] Majid Ghasemi & Yusuf Rajabally, *Small Fiber Neuropathy in Unexpected Clinical Settings: A Review*, 62 MUSCLE & NERVE 167 (2020).
[21] U. Seneviratne & S. Gunasekera, *Acute Small Fibre Sensory Neuropathy: Another Variant of Guillain-Barré Syndrome?*, 72 J. NEUROLOGY, NEUROSURGERY & PSYCHIATRY 540 (2002).
[22] Nobuhiro Yuki et al., *Acute Painful Autoimmune Neuropathy: A Variant of Guillain-Barré Syndrome*, 57 MUSCLE & NERVE 320 (2017).
[23] Antonino Uncini & Nobuhiro Yuki, *Sensory Guillain-Barré Syndrome and Related Disorders: An Attempt at Systemization*, 45 MUSCLE & NERVE 464 (2011).

monophasic course, and increased CSF. *Id.* at 4–5. Uncini & Yuki was an article that "tentatively classif[ied] sensory [GBS]" into three subtypes, "acute sensory demyelinating polyneuropathy; acute sensory large-fiber axonopathy-ganglionopathy; and acute sensory small-fiber neuropathy-ganglionopathy." Pet'r's Ex. 44 at 1. The authors noted that "[i]n the last decade a few patients who presented with an acute [SFN], increased [CSF] protein level, normal reflexes, and normal motor and sensory conduction studies were believed to have a possible GBS variant." *Id.* Reviewing a total of 10 patients, the authors found that CSF was elevated in six of the seven tested, a preceding illness was reported in five, and all patients showed normal strength, distal sensory loss for pain and temperature, and normal proprioception and vibration sense. *Id.* at 4. The authors opined that "the rapid onset, increased CSF protein level, and the disease course suggest that this disorder is related to GBS." *Id.* They also identified the five additional patients from the Souyah et al.[24] case study, which they interpreted as "post-vaccination GBS involving small fibers." *Id.*

To bring the articles together, Dr. Kolb testified that molecular mimicry is "well described in GBS, and . . . these papers [] point out the fact that a very similar phenomenon -- or they believe a very similar flaw line is probably happening to the small fibers specifically." Tr. 133. Dr. Kolb then opined that Petitioner did "not have classic [GBS] -- [he thought Petitioner] definitively has [SFN], and what this mounting literature [is] suggesting is that acute onset [SFN] falls within that category of sensory [GBS]." Tr. 134. He also referenced Gendre et al., a study examining acute onset SFN, which noted that "immune dysfunction is probably the cause of [acute onset] SFN." Pet'r's Ex. 31 at 10. The authors noted that "[a] precipitating event was frequently found, either infection or vaccination, as in . . . other types of immune neuropathies, such as [GBS] or post-COVID neuropathy." *Id.* Dr. Kolb interpreted this to be supportive of his theory "[b]ecause for some autoimmune diseases, we think that there are inciting events, whether that's just theory molecular mimicry or molecular mimicry and a variety of other mechanisms." Tr. 135. "[T]he immune system can certainly be one of the causes of [SFN]. And they're pointing out that that can specifically be the case for acute onset [SFN]." *Id.* Dr. Kolb also discussed several more articles examining the possibility of SFN being a variant of GBS. Tr. 135–39. He opined that "you can have acute onset [SFN], . . . [and] it can happen in response to infections, et cetera, and also to vaccines." Tr. 139–40. "These papers are suggesting kind of an evolution of GBS to now have a subcategory that involves small fibers." Tr. 140. When asked about the relevance of this literature to the case at hand, Dr. Kolb admitted that "Petitioner did not have GBS," but rather "that she had acute onset [SFN]." Tr. 179. When I asked Dr. Kolb whether one would expect to see other indicators of autoimmunity in a patient, he explained that it was "different with every autoimmune disease . . . it depends on the[] type of [SFN]." Tr. 202. He analogized the process to lupus, another autoimmune disease, stating the following:

> [L]upus is an autoimmune disease that can cause a huge variety of symptoms. [] And if somebody's presenting with an abrupt flare or new onset of lupus, I would probably expect that they would have a ton of different symptoms. If somebody's presenting with an acute [SFN] and the small fibers are the only thing that's affected, then it may be that they present with just those symptoms.

*Id.*

---

24 Nizar Souayah et al., *Small Fiber Neuropathy Following Vaccination for Rabies, Varicella or Lyme Disease*, 27 VACCINE 7322 (2009).

Turning specifically to Petitioner, Dr. Kolb acknowledged that Hashimoto's disease could cause SFN. Tr. 140. However, he argued that this was not the cause of her SFN, because Petitioner's symptoms appeared rapidly and Petitioner's Hashimoto's disease was "a very well controlled autoimmune disease over . . . 20 years." *Id.* He opined that his "reasoning is that the timing of it makes much more sense with a recent stimulation of her immune system with the vaccine as opposed to an autoimmune disorder that she's had for 25 . . . years." Tr. 143. Dr. Kolb also reasoned that if Petitioner were to have developed SFN from her Hashimoto's disease it would have been "slowly developing," as opposed to the "very abrupt presentation" of Petitioner's symptoms. *Id.* He argued that Dr. Varrato's diagnosis of "GBS/autoimmune post-vaccination [SFN]" supported this analysis because "[s]he had the abrupt onset of neuropathy symptoms . . . with no previous neurologic history. And so certainly when somebody presents with that, one of our leading suspicions, especially if you rule out other things, is that it's coming from their immune system." Tr. 145. On cross examination, Dr. Kolb also acknowledged that Petitioner had received prior flu vaccines without incident; however, he noted that some of the literature discussed "a decreased latency period in response to something like a vaccine for people who've seen a vaccine before, because their immune system has already been primed by that." Tr. 188. When asked whether he was referring to a recall response, Dr. Kolb responded by stating "I don't know what that means." Tr. 189. He also admitted that the "tapping" sensation Petitioner felt on the left side of her face would "be a peculiar symptom for GBS." Tr. 192. I asked Dr. Kolb to further expand on his discussion of priming the immune system, and he stated that he would not "state it that strongly. [He] would just that that is a possible explanation for why it happened so quickly. [He] would not posit that that is the reason why it happened so quickly, but [he thought] it's a possible explanation." Tr. 205. When I asked for clarification about what the most likely reason for Petitioner's presentation was, he explained that "acute onset [SFNs] are rare, and they probably happen on a bell curve type distribution, and that some people will present really early." *Id.*

On cross examination, Dr. Kolb admitted that he is "not an immunologist," and that his opinion stemmed from "the literature connecting [SFN] to vaccines." Tr. 174–75. Dr. Kolb further admitted that the articles he presented explicitly discussing SFN in the context of vaccination were case reports, and that case reports "are not evidence of causation." Tr. 176. He also admitted that he did not "explain how all these immunological mechanisms worked together in [his] report." *Id.* Dr. Kolb was also asked to address his theory regarding the possibility that adjuvants from the vaccine induced autoimmunity in Petitioner, given that the vaccine Petitioner received did not contain adjuvants. Tr. 177. He replied that he "wasn't aware of that." *Id.* Dr. Kolb also admitted that he did not identify a specific antigen in the vaccine that could act as a potential mimic. *Id.*

Dr. Kolb then discussed the timing of Petitioner's symptoms, opining that "[a] few days to six weeks" is an appropriate timeframe between "vaccination and onset of autoimmune disease." Tr. 147–48. He explained that a two-day onset of Petitioner's symptoms would be reasonable because the literature discussed "one to two to three day[ onset] for multiple cases." Tr. 148. However, Dr. Kolb then opined that based on Petitioner's testimony and her medical record, the onset of her symptoms occurred three days after vaccination. Tr. 149. He also referenced Schonberger et al., an article discussing GBS onset after the 1976 H1N1 vaccine, and Souayah et al., an article discussing SFN following vaccination with Lyme, rabies, and COVID-19, as supportive of his onset theory. Tr. 150. On cross examination, Dr. Kolb acknowledged that Petitioner's "tapping" sensation was likely not indicative of her GBS onset, and instead attributed it to her later onset of "tingling and numbness that she described in her upper extremities." *Id.*

**2. Report and Testimony of Dr. Callaghan**

**a. Dr. Callaghan's Report**

Dr. Callaghan began his report with a discussion of Petitioner's diagnosis, arguing that she did "not meet the diagnostic criteria for [SFN]." Resp't's Ex. A at 7. He cited to Devigili et al. to support this notion, which provided the following criteria for the diagnosis of SFN:

> (i) clinical signs of small fib[er] impairment . . . ; (ii) abnormal warm or cold thresholds, or both, at the foot as assessed by QST; and (iii) reduced IENFD at the distal leg. Exclusion criteria were any clinical sign of large fib[er] impairment (e.g. light tough and vibratory sensation, deep tendon reflexes, limb or gait ataxia) and any abnormality at [NCS].

*Id.* (citing Resp't's Ex. A, Tab 3). Dr. Callaghan argued that Petitioner did not have QST testing performed, had normal IENFD at her distal leg, and her "minimally reduced" IENFD in her thigh "is not in the diagnostic criteria." *Id.* Dr. Callaghan also challenged the reliability of the service used to analyze Petitioner's biopsy sample, Therapath, claiming it "has a high false positive rate," citing to "over 500 skin biopsies from research studies and personal experience." *Id.* at 7–8. "The consensus of the skin biopsy experts is that Therapath often produces false positive results." *Id.* at 8. Dr. Callaghan also argued that Petitioner met two of the exclusionary criteria because she had "abnormal light touch and reflexes" and weakness documented on "several examinations." *Id.* "Weakness, imbalance, falls when not looking, and trouble typing all indicate large fiber involvement if the peripheral nervous system is involved." *Id.* However, Dr. Callaghan admitted that Petitioner "never had large fiber nerve involvement" as evidenced by her two normal EMG/NCS studies. *Id.* Dr. Callaghan then listed the following symptoms as inconsistent with SFN: "uncontrollable shaking of her right arm, fatigue, emotional distress, blurred vision, dizziness, anxiety, panic attacks, whole body pain twice per month, palpitations, lightheadedness, shortness of breath, and a sense of impending doom." *Id.* He also agreed with Dr. Kolb that Petitioner did not have sensory GBS, as Petitioner's normal EMG/NCS and lumbar puncture results would not indicate a diagnosis of GBS. *Id.*

Moving to whether SFN was associated with vaccination, Dr. Callaghan observed that Dr. Kolb provided case reports of SFN following HPV, Lyme, varicella, rabies, and COVID-19 vaccines, but not the flu vaccine. Resp't's Ex. A at 8. He also contested Dr. Kolb's reference to Schonberger et al., arguing that the 1976 flu vaccination's association with GBS did not support a link between the flu vaccination and SFN, as "GBS is a large fiber neuropathy." *Id.*

Regarding the timing of Petitioner's symptoms, Dr. Callaghan asserted that he and Dr. Kolb agreed that Petitioner's symptoms began two days after vaccination, but that Dr. Kolb did not provide evidence to support that this would be a reasonable period for onset. Resp't's Ex. A at 9. According to Dr. Callaghan, Dr. Kolb's argument that the development of symptoms 24 hours following COVID-19 vaccination is insufficient because "there is a clear difference between the development of an autoimmune attack on peripheral nerves and the systemic symptoms one

experiences after vaccination." *Id.* Further, he cited to Langmuir et al.[25] to show that the 1976 flu vaccine/GBS study did not support a two day onset as "there was no increased risk until 3.5 days." *Id.* (citing Resp't's Ex. A, Tab 4).

Dr. Callaghan next addressed Dr. Kolb's proposed theory of causation, arguing that "he only provides a review on molecular mimicry and autoimmunity in general that discusses sharing of epitopes between host and microbe pertaining to the [flu] vaccine and GBS, but no evidence is provided to support the statement within the review." Resp't's Ex. A at 9. Dr. Callaghan also argued that Dr. Kolb provided no evidence specific to the flu vaccine's role in developing SFN. *Id.*

**b. Dr. Callaghan's Testimony**

Dr. Callaghan testified at the entitlement hearing held on March 19, 2025. Tr. 214. He explained that SFN can be diagnosed "using either clinical criteria or, you know, the combination of your history and examination and testing." Tr. 218. With regard to the Besta criteria from Devigili et al., Dr. Callaghan testified that the "large fiber sensory impairment" referenced by the exclusionary criteria referred to "vibration abnormalities, proprioception abnormalities, and weakness" or motor fiber impairment. Tr. 220. He also pointed to Petitioner's testimony and initial presentation where she described her legs as "heavy" and as "sandbag legs" as evidence her initial symptoms included weakness, and thus was not a symptom of SFN. Tr. 221. He admitted that her decreased pinprick sensation would be a sign of SFN, but that her gait issues would be "either a cerebellar or a large fiber sign." Tr. 224. Dr. Callaghan also opined that Petitioner's "uncontrollable shaking in her arm" would not be associated with SFN and called it "one of many different instances in the medical record, indicating nonphysiologic signs." Tr. 225. He similarly highlighted Petitioner's complaints of fatigue, emotional distress, anxiety, blurred vision, and dizziness at her initial presentation to Dr. Varrato as "they're not typically seen in someone with [SFN]," adding that her anxiety "indicates that there is a psychiatric diagnosis as well, which is important." *Id.* He added that Petitioner's description of a "toothache-type pain" would not be typical for SFN, but indicate a musculoskeletal etiology. Tr. 226. When asked on cross-examination about Petitioner's diagnosis, Dr. Callaghan explained that Petitioner's "weakness and large fiber signs" were "the biggest crux of this case. She has all sorts of symptoms that don't fit anything with [SFN] at all, including weakness and balance, uncontrollable shaking, tremor." Tr. 251. Dr. Callaghan did acknowledge that it was possible for a patient to have GBS without CSF or EMG readings, but stated that Petitioner's repeat EMG showing negative results "makes it as close to zero as I'll ever tell you something is zero." Tr. 268.

Dr. Callaghan further argued that Petitioner was suffering from a psychological etiology, specifically highlighting her February 23, 2018 visit with Dr. Varrato. Tr. 228. He stated, given Petitioner's normal EMG and MRI, and that "[s]he was very emotional, with anxiety and insomnia, . . . there was a big disconnect between her inability to work and having small fiber predominant symptoms . . . these large fiber type symptoms of imbalance and weakness are not corroborated with her EMG studies." Tr. 229. Instead, Dr. Callaghan referred to these as "nonphysiologic features." *Id.* He also referenced Petitioner's psychiatric evaluation, where he opined that her

[25] Alexander D. Langmuir et al., *An Epidemiologic and Clinical Evaluation of Guillain-Barré Syndrome Reported in Association with the Administration of Swine Influenza Vaccines*, 119 J. EPIDEMIOLOGY 841 (1984).

claims of being unable to return to work did not "make a whole lot of sense with [SFN]. I've been practicing for 16 years. I've never put anybody on disability for a [SFN]." Tr. 231. When asked how he could explain Petitioner's symptoms given her normal EMG studies, he stated that "she has lots of symptoms that are not explained from a physiological basis," but she did not have a large fiber neuropathy. Tr. 252. He also agreed that Petitioner had no mental health diagnosis prior to the onset of her symptoms. *Id.* He also acknowledged that a traumatic neurological event could lead a patient to develop depression and anxiety. Tr. 253. Despite this, he disagreed with Dr. Varrato's opinion that Petitioner could not return to work during her treatment, as SFN patients "don't have problems with weakness or imbalance or the ability to carry out normal activities." Tr. 258. On re-cross examination, Dr. Callaghan was asked about Gemignani et al., which reviewed non-length-dependent SFN and listed fatigue, cramps, malaise, and deep aching as potential symptoms, and he argued that the article was "just saying that there are patients with [SFN] that have some of these symptoms," which he called "nonspecific." Tr. 271–72 (citing Pet'r's Ex. 21).

Dr. Callaghan then discussed the results of Petitioner's skin biopsy, which he opined "doesn't make a whole lot of sense." Tr. 234. He explained that Petitioner's symptoms were "confined to the hands and feet, other than intermittently," and thus her biopsy showing reduced IENFD in her thigh was incompatible with her presentation. *Id.* Dr. Callaghan argued that the disconnect existed "because Therapath often has results that don't make a lot of sense." *Id.* He testified that his practice at the University of Michigan formerly used Therapath, but "[w]e realized that the results were almost always positive, and we weren't sending it in cases where we thought for sure people had it." Tr. 235. He asserted that "it became very clear that . . . they were having a lot of false positives, and therefore, that the only real way to get good skin biopsy data is to go to the large academic centers." *Id.* He explained that while the process of collecting a skin biopsy sample is "quite simple, . . . [i]t's really in the staining and counting that you need the expertise." Tr. 236. Dr. Callaghan then referenced a study regarding SFN biopsy results:

> Dr. Kolb and I have a good friend, Dr. Gibbons at Harvard, and he actually did a study where he took patients with biopsy-proven [SFN] and antibodies to -- they were supposed to be autoimmune [SFN]. And the first thing he did was repeat the skin biopsies and found that 40 percent of the times, they were . . . normal. So even people that have had biopsy-proven [SFN] and antibodies, almost half of them actually didn't have abnormal skin biopsy results when repeated at a good academic lab.

*Id.* On cross examination Dr. Callaghan admitted that Petitioner's skin biopsy of her thigh showed "significantly reduced [IENFD]." Tr. 250. He explained that while he did not provide any evidence of problems with Therapath's testing or that Petitioner's biopsy was completed incorrectly, he relied on his "own clinical experience and that of our neuromuscular group here at the University of Michigan." *Id.* He stated that it was the unofficial policy of his clinic not to "engage with Therapath at all." Tr. 265.

Dr. Callaghan then addressed Dr. Varrato's diagnosis of "idiopathic [SFN] that was autoimmune," which he stated he disagreed with. Tr. 238. He argued that there was no evidence in the record as to why Dr. Varrato believed Petitioner's condition to be autoimmune or that there was any evidence that Petitioner's condition was autoimmune. *Id.* Dr. Callaghan instead agreed

with Dr. Margolies' impression, which implicated Petitioner's hypothyroidism in the development of her SFN, as "we know hypothyroidism, unlike vaccines, is, [] a cause of all sorts of neuropathy, including large, small[,] and mixed." Tr. 241. He also agreed with Dr. Ziv's differential diagnosis of "conversion disorder, somatization, and/or malingering." Tr. 242. On cross examination, Dr. Callaghan opined that conversion disorder was "probably the most likely of the three." Tr. 254. However, he acknowledged that none of Petitioner's treating physicians diagnosed her with conversion disorder and that Petitioner continued to take 1,800mg of gabapentin for her symptoms. Tr. 257. He also acknowledged that he did not provide an alternative diagnosis in his report, but that now he had adopted Dr. Ziv's differential diagnosis of conversion disorder, somatization, and malingering. Tr. 259. He opined that the chance Petitioner suffered from SFN was "close to zero," but admitted there was a possibility that she could have SFN and "then a bunch of symptoms that can't be explained." Tr. 260. When I asked him how he would handle a patient who presented with Petitioner's symptoms, Dr. Callaghan stated that he would perform an EMG, as well as MRIs of the brain and cervical spine. Tr. 263. If these tests were normal, then Dr. Callaghan would refer the patient to psychiatrist. *Id.* When asked why no psychiatric conditions appeared on Petitioner's differential diagnosis from her treating physicians, Dr. Callaghan argued that "the treating physician got it wrong." Tr. 263–64. He then provided the following explanation for what he believed was Dr. Varrato's line of thinking:

> [T]his is a classic mistake, which is, you know, first he's like, well, you know, I think you have sensory GBS. But then the EMG is like completely incompatible. He's like, well, maybe it's in the brain or spinal cord. But the imaging is completely normal. And then he's like well, maybe it's a [SFN]. And then he sends the test to a bad lab and gets a weird result and then is like, well, you know, maybe it's this one thigh nerve fiber density is slightly low; maybe that's the – now I have an answer, and I don't have to go through and start considering things like conversion disorder, which are incredibly hard to treat and difficult to discuss.

Tr. 264. Dr. Callaghan adopted the reasoning of Dr. Ziv for when Petitioner could have developed conversion disorder, pointing to her having to work longer hours in the context of a potential reduction in pay, "along with the fact that she developed severe anxiety and depression, you know, which is also -- can be a trigger in and of itself." Tr. 266.

Turning to the literature filed by Petitioner, Dr. Callaghan argued that the Souayah et al. article did not involve the flu vaccine or that any of its patients shared similar symptoms or presentation as Petitioner. Tr. 244. Regarding the articles discussing sensory GBS, Dr. Callaghan explained that such a diagnosis requires an acute onset, a monophasic progression, and elevated CSF protein, with "oftentimes demyelinating features on EMG." *Id.* He also noted that in "all cases" of sensory GBS referenced by Petitioner, the patients had elevated CSF levels, while Petitioner's was normal. Tr. 245. He also argued that of the literature filed by Petitioner, only one case of SFN following the flu vaccine was documented, in contrast to several articles relating to SFN developing from hypothyroidism. Tr. 246.

On cross examination, Dr. Callaghan acknowledged that a flu shot can cause GBS and that GBS can affect the small fibers. Tr. 249. When asked whether SFN was a GBS variant, Dr. Callaghan provided the following response:

> I mean, that's, you know, kind of getting into semantics. You know, it's probably very different, because, you know, knowing a lot about the pathophysiologic nature of GBS, you know, most of it has to do with the myelin or the nodes, and those aren't even present on the small fibers. So it probably is a very different entity, but, you know, whether you want to call someone that has elevated protein in their CSF as small fiber GBS or call it its own entity, I think that's just, you know, what kind of term you want to give it.

Tr.253. However, he did acknowledge that there was literature which referred to SFN as a GBS variant. *Id.*

### 3. Report and Testimony of Dr. Vasu

#### a. Dr. Vasu's Report

Dr. Vasu began his report by noting that he would not comment on whether GBS or SFN was an accurate diagnosis, but rather he would limit his comments to "the cause and risk factors of GBS and SFN and the potential immune system involvement in these conditions specific to [Petitioner's] case. Resp't's Ex. C at 4. He described GBS as "the most common and severe form of acute paralytic neuropathy," which includes "several recognizable variants with distinct clinical and pathological features." *Id.* at 4–5. (citing Resp't's Ex. C, Tab 1).[26] Willison et al. described GBS as a "post-infectious disorder, as shown by the rapidly progressive, monophasic disease course [] shortly after infection." Resp't's Ex. C, Tab 1 at 2. The authors noted that two-thirds of adult patients reported a prior respiratory or gastrointestinal infection within four weeks of symptom onset. *Id.* Such infections associated with GBS include *C. jejuni*, cytomegalovirus, Epstein-Barr virus, flu A virus, *Mycoplasma pneumoniae*, and *Haemophilus influenzae*. *Id.* Dr. Vasu also provided case reports associating Hashimoto's disease and hypothyroidism with GBS. Resp't's Ex. C at 5 (citing Resp't's Ex. C, Tab 4;[27] Resp't's Ex. C, Tab 5).[28] He argued that while it had been "suggested" that GBS could develop in individuals following flu infection "and, in rare cases, after immunization," no such evidence existed apart from the link between the 1976 swine flu vaccination campaign. *Id.* Lehmann et al.[29] reviewed the association of GBS and the flu virus by examining multiple epidemiological studies of patients following both flu infection and vaccination. Resp't's Ex. C, Tab 6 at 1. The authors concluded that apart from the 1976 swine flu vaccination program, the flu vaccine "has probably not caused GBS or, if it has, rates have been extremely low." *Id.* The authors noted the possibility of anti-GD1b antibodies as potentially relevant to the pathogenesis of GBS, but noted that whether GBS was associated with ganglioside antibodies was not known. *Id.* at 4. The authors also directly addressed the timing of GBS after flu vaccination, providing the following analysis:

---

[26] Hugh J. Willison et al., *Guillain-Barré Syndrome*, 388 LANCET 717 (2016).

[27] M. Toudou Daouda et al., *Guillain-Barre Syndrome and Hashimoto's Thyroiditis*, 109 QJM 547 (2016).

[28] Roger Behar et al., *Guillain-Barré Syndrome Associated with Hashimoto's Thyroiditis*, 233 J. NEUROLOGY 236 (1986). Respondent only filed the first page, not the entire article.

[29] Helmar C. Lehmann et al., *Guillain-Barré Syndrome After Exposure to Influenza Virus*, 10 LANCET INFECTIOUS DISEASE 643 (2010).

> The question arises as to what period after vaccination is reasonable to suggest a causal association. Most studies have used a period of [six] weeks, which is based on the significantly increased risk attributed to immune[z]ation in the 1976 US national [flu] immune[z]ation program[]. The onset of GBS after infection is usually seen at around [two] weeks, which suggests a primary immune response to that infection. Causality does not, therefore, seem a reasonable assumption when symptoms of GBS occur a within a very small number of days after vaccination.

*Id.* at 4–5. Similarly, Israeli et al.[30] reported the onset of GBS symptoms following flu vaccination to be after 10 days. Resp't's Ex. C, Tab 7.

Turning to SFN, Dr. Vasu cited several studies that associated hypothyroidism with the development of SFN. Resp't's Ex. C at 6 (citing Resp't's Ex. C, Tab 8;[31] Resp't's Ex. C, Tab 9;[32] Resp't's Ex. C, Tab 10;[33] Resp't's Ex. C, Tab 11).[34] In particular, Gupta et al. noted that hypothyroidism "may induce neurological abnormalities at an early stage of the disease." Resp't's Ex. C, Tab 9 at 1. The authors opined that this was due to a combination of two factors: weight gain and energy deficits. *Id.* at 4. "[A]ccumulation of mucopolysaccharides, chondroitin sulfate, and hyaluronic acid occurs in the interstitial spaces which tends to retain water and hence result in weight gain." *Id.* The deposition of these molecules "in the tissues surrounding the nerves may lead to compression over the peripheral nerves resulting in swelling and degeneration." *Id.* Regarding the energy deficit, the authors explained that this was caused from "decreased oxidation of nutrients as thyroid hormones are involved in stimulation of the mitochondrial respiratory activity to produce energy." *Id.* This reduced degradation of glycogen "leads to accumulation of glycogen deposits around the nerves," which "may initially damage the functions and later on bring about structural changes in the nerves." *Id.* "Nerve compression and axonal degeneration may act together to produce peripheral neuropathy in hypothyroidism." *Id.* However, the authors cautioned that this only applied to clinically presenting hypothyroid patients, as "in another study done on subclinical hypothyroid patients, no alterations in electrodiagnostic parameters was observed which signifies that there are no peripheral nerve dysfunctions in subclinical hypothyroidism." *Id.* The authors also recognized another study where a "decrease in [IENFD] was found to be [the] cause of neuropathy in subclinical hypothyroidism." *Id.* at 4–5. That study, Magri et al., examined IENFD in a group of patients with untreated hypothyroidism either presenting as overt or subclinical. Resp't's Ex. C, Tab 10 at 1. The authors found that in cases of both overt and subclinical hypothyroidism, SFN presented as length dependent, with 60% of overt patients having abnormal skin biopsies at their distal leg. *Id.* Conversely, in patients with subclinical hypothyroidism, only 25% of patients had abnormal biopsies from the distal leg, while 12.5% had abnormal biopsies from the proximal thigh. *Id.* "In all patients, the [IENFD] reduction

---

[30] Eitan Israeli et al., *Guillain–Barré Syndrome—A Classical Autoimmune Disease Triggered by Infection or Vaccination*, 42 CLINICAL REVS. ALLERGY & IMMUNOLOGY 121 (2012).
[31] Kristin Orstavik et al., *Pain and Small Fiber Neuropathy in Patients with Hypothyroidism*, 67 NEUROLOGY 786 (2006).
[32] N. Gupta et al., *Peripheral and Central Nervous System Involvement in Recently Diagnosed Cases of Hypothyroidism: An Electrophysiological Study*, 6 ANNALS MED. & HEALTH SCIS. RSRCH. 261 (2017).
[33] Flavia Magri et al., *Intraepidermal Nerve Fiber Density Reduction as a Marker of Preclinical Asymptomatic Small-Fiber Sensory Neuropathy in Hypothyroid Patients*, 163 EUR. J. ENDOCRINOLOGY 279 (2010).
[34] Endre Pal et al., *Small Fiber Neuropathy: Clinicopathological Correlations*, 2020 BEHAVIOURAL NEUROLOGY 1 (2020).

was length dependent." *Id.* Dr. Vasu also acknowledged that Petitioner had presented case reports of SFN following HPV, rabies, varicella zoster, and Lyme disease, but that "there is no clinical or epidemiological data suggesting a link between the flu vaccine and SFN." Resp't's Ex. C at 6.

Dr. Vasu next addressed Dr. Kolb's theory of causation, which he described as "vague and not based on any specific case report or original observation." Resp't's Ex. C at 7. He argued that the case reports relied on by Dr. Kolb were not specific to the flu vaccine and that they did "not present any epidemiological data, or even any peer-reviewed case reports, showing an association between the flu vaccine and SFN." *Id.* He also noted that the reports filed by Petitioner also discussed the association between hypothyroidism and SFN, which he argued Dr. Kolb did not discuss in his initial report. *Id.* "In fact, there is greater evidence in the scientific literature to support that the SFN is caused by Hashimoto's thyroiditis and hypothyroidism than by widely used vaccines." *Id.* Dr. Vasu that opined that "Dr. Kolb's scientific reasoning to support [P]etitioner's case linking her SFN to [the] flu vaccine is not based on relevant or reliable scientific evidence." *Id.* at 8.

Turning to the mechanisms proposed by Dr. Kolb, Dr. Vasu first explained that "vaccines inoculated into humans contain foreign components. . . . The human immune system recognizes these molecules as non-self/foreign and mounts a response which could fade away gradually, but can last as residual T and B cell memory response lifelong." Resp't's Ex. C at 8. He noted that it was "not known" whether Petitioner's flu vaccine contained an adjuvant, but argued that their inclusion was common practice, as "the induction of an immune response to a foreign antigen to protect against specific pathogens is the very nature and function of vaccinations." *Id.* at 8–9. He then provided the following explanation as to why he disputed the mechanisms proposed by Dr. Kolb:

> Molecular mimicry, polyclonal activation, epitope spreading, and bystander activation are, as detailed below, longer processes than what occurred in [P]etitioner's case. Persistent activation of pro-inflammatory immune function in the context of specific antigen presentation could result in antigen mimicry associated autoimmune response[]. Similarly, epitope spreading is the outcome of a long-term inflammatory process. Prolonged bystander and polyclonal activations of immune function by microbial infections can aid the autoimmune process. However, immune activation induced by adjuvanted vaccines and antigen presentation does not last long and is not expected to trigger autoimmunity within a short period of [two-to-three] days through any of the mechanisms mentioned above.

*Id.* at 9. He explained that while proinflammatory cytokines like IL-1 and IL-6 can be produced within 24 to 48 hours after vaccination, "this innate immune cell response alone will not induce autoimmunity involving T cells and B lymphocytes." *Id.* at 10. He instead stated that reports showed IL-6 would begin to cause neuronal tissue damage within two-to-three weeks, but that it was "unlikely" that a vaccine could induce "high enough levels [of cytokines] to affect distant organs/tissues and cause damage in a short period." *Id.*

Dr. Vasu then discredited molecular mimicry as a theory outright, arguing that "the immune response against vaccine components . . . does not induce an immune response to self-

antigens, including neuronal components, leading to an autoimmune response." Resp't's Ex. C at 9. Although many microbes share sequence or structural homology to human molecules, "molecular similarities, if any, between vaccine antigens and self-antigens will result in ignorance/tolerance rather than immune activation due to the well-regulated nature of immune function." *Id.* (citing Resp't's Ex. C, Tab 18).[35] Wraith et al. examined whether vaccines could cause autoimmune diseases and discussed the immune systems "fail-safe mechanisms," which the authors stated "have evolved to ensure that the immune response to infection is both focused and controlled. . . . Thus, autoimmune disease is remarkably infrequent despite the high, hypothetical risk of molecular mimicry and the bystander activation that can take place during infection." Resp't's Ex. C, Tab 18 at 4. The authors argued that these mechanisms "apply equally to the host response to vaccination." *Id.* The authors also addressed the association between GBS and the flu vaccine, noting that after the 1976 swine flu vaccination campaign "no significant increase in the development of [GBS] was noted." *Id.* at 5. Given these fail-safe mechanisms in the immune system, Dr. Vasu instead opined that genetic susceptibility plays a larger role in the development of autoimmune disease than the mechanisms proposed by Dr. Kolb. Resp't's Ex. C at 9.

Dr. Vasu next addressed the timing of Petitioner's symptoms in relation to her vaccine with specificity, arguing that "there is no evidence to support the notion that vaccination induced immune response can cause autoimmune SFN associated symptoms within [two or three] days." Resp't's Ex. C at 11. Rather, Dr. Vasu opined that "a minimum primary immune response involving B and T cells with antigen specificity could take at least a week." *Id.* He also argued that a cross-reactive response "would require the challenge or repeated presentation of endogenous antigens under a strong pro-inflammatory environment." *Id.* Dr. Vasu pointed to Petitioner's five prior flu vaccinations without incident and argued that if Petitioner was susceptible "to flu vaccine induced SFN or GBS [it] should have appeared in some form, weeks or months after the earlier doses of flu vaccines." *Id.* He also critiqued Dr. Vasu's use of the COVID-19 vaccine as an analogy to the timing of Petitioner's symptoms, arguing that that data surrounding the COVID-19 vaccine was unknown, and that "vague comparisons with the adverse effects of COVID-19 vaccines does not substantiate a temporal relationship between [P]etitioner's flu vaccination and the timing of acute autoimmune SFN and GBS-like symptoms." *Id.* at 12.

**b. Dr. Vasu's Testimony**

Dr. Vasu testified at the entitlement hearing held on March 19, 2025. Tr. 273. He stated that Dr. Kolb did not provide an explanation for how his different proposed mechanisms worked together to cause SFN. Tr. 279. Focusing specifically on molecular mimicry, Dr. Vasu opined that "almost all vaccine antigens are specific to pathogens . . . [a]nd so molecular mimicry is not very common." Tr. 280. However, he acknowledged that "there are reports suggesting that certain molecules have certain biological similarities with host antigens." *Id.* According to Dr. Vasu, in order for a vaccine to cause molecular mimicry, it would require "a considerable degree of similarities in the vaccine antigen and host antigen[;] . . . a strong, robust proinflammatory response that can break the self-tolerance, because it's a cross-reactivity with self-antigens[;] . . . [and] that the antigen has to be expressed at the site of injury or the target." Tr. 280–81. He argued that Dr. Kolb provided none of this information in his reports or testimony. Tr. 282. In particular, Dr. Vasu emphasized the importance of identifying a specific antigen because "if there is no antigen target

[35] David C. Wraith et al., *Vaccination and Autoimmune Disease: What is the Evidence?*, 362 LANCET 1659 (2003).

known, then it is hard to state that it's an autoimmune phenomenon." Tr. 283. Absent these findings, Dr. Vasu testified that a literature review for studies of cross-reactivity and epidemiological studies regarding the vaccine's role in this specific pathology would be needed to establish molecular mimicry. Tr. 283–84. On cross examination, Dr. Vasu admitted that "based on the literature and epidemiological studies" he would agree with Dr. Callaghan that a flu vaccine can cause GBS, including variants of GBS "if there is an antigen target or if they share the same antigen." Tr. 297. He reasoned that the mechanism for this would be "a strong proinflammatory response induced by something in the flu vaccine" or "some sort of cross-reactivity," such as molecular mimicry. Tr. 298. However, Dr. Vasu argued that while "papers suggest" that GBS can be caused via molecular mimicry, "there is no conclusive experimental evidence to show that that is the case, but it appears to be an accepted fact that flu vaccine can cause GBS." *Id.*

Dr. Vasu further critiqued Dr. Kolb's use of GBS studies to explain molecular mimicry causing SFN after the flu vaccine, arguing that "GBS and the SFN impact different regions of the nerve, and then some of them have ganglioside antigens and the [SFN] probably does not have [] such antigens expressed." Tr. 285. "So if there is molecular mimicry involved in it for GBS, that may not be applicable to the molecular mimicry in the aspect in SFN, because there is no relevant antigen or relevant cross-reactivity described anywhere in the literature." Tr. 286. Dr. Vasu also noted that Petitioner's antibody panel was normal apart from her thyroid peroxidase antibody, which was present prior to her vaccination due to her Hashimoto's disease. Tr. 288–89. On cross examination, Dr. Vasu argued that Dr. Varrato's opinion about Petitioner's SFN having an autoimmune etiology was "an opinion without evidence . . . because [he] did not see anything relevant to inflammation or autoimmunity in [] Petitioner's documents." Tr. 302. He also argued that autoimmune SFN would require "immune cell infiltration," which he stated was not present on Petitioner's biopsy report. Tr. 303. He admitted that he was not "100 percent certain" that the vaccine did not cause Petitioner's SFN, "but [] would say most likely [the vaccine] did not cause [] her SFN." Tr. 304.

Turning to the case reports filed by Dr. Kolb, Dr. Vasu opined that those referencing rabies, varicella, and Lyme disease vaccines were not applicable in explaining how the flu vaccine could cause SFN. Tr. 291. He explained that "these vaccines plus Fluzone, they all use totally different antigens, antigens from a different pathogen, and the antigens against . . . different pathogens. So there is no molecular similarities between [] these antigens, and they're from [] different pathogens." *Id.* He also critiqued Dr. Kolb's use of Kafaie et al., as it was a case report based on the existence of a petition in the Vaccine Injury Compensation Program for SFN caused by the flu vaccine. *Id.* (citing Pet'r's Ex. 23). He noted that the article stated that "this petition alone cannot be used to assess the relationship between vaccine and SFN." *Id.*

Dr. Vasu also testified about the timing of Petitioner's symptoms, which he opined developed too quickly to be related to her flu vaccine based on the mechanisms proposed by Dr. Kolb. Tr. 292. He explained that

> based on the antigen mimicry hypothesis . . . it has to be an antigen-specific immune response . . . of T cells and B cells. Inducing response in those cells would take much longer than three days, and to induce an effective immune response -- that means peak immune response to cause a pathogenesis -- would take a minimum seven days.

*Id.* Dr. Vasu then addressed "recall response," which he described as when T and B cells "become memory cells [that] stay in your body. Then when they are exposed to the same antigen again, they get activated relatively more quickly than the primary immune response, so you generally call it a recall response." Tr. 293. He then admitted that "the fact that [] Petitioner had received prior flu vaccines change[d his] opinion about the timing being too fast . . . to a certain degree, but not within the two or three days." *Id.* He stated that a recall response to the flu vaccine "is definitely expected within three to four days." *Id.* However, he caveated this by saying that in Petitioner's case "the memory response has to be a self-antigen-specific response" in order to have caused her SFN via molecular mimicry. Tr. 294.

> If [] Petitioner had the self-antigen-specific response in the past, during five rounds of flu vaccinations, she might have shown symptoms or some level of autoantibodies. But it does not look like that happened. So probably this batch of flu vaccine, theoretically if it had caused the cross-reactive immune response that is supposed to be a naïve immune response rather than a recall immune response to self-antigen.

*Id.* On cross examination, Dr. Vasu was asked why ranges for symptom or disease onset existed between patients who may be exposed to an environmental stimulus. Tr. 299–300. He provided the following response:

> In most cases, we really don't know what exactly the -- what the preexisting conditions were, what kind of immune response going on in them. And also in the case of infection, it depends -- it also depends on the severity of the infection. And in vaccination cases, [] to my understanding, there is no conclusive evidence suggesting that a [] particular molecular mechanism is involved, molecular mechanism like antigen mimicry is involved. But, you know, it's mostly temporal association. It is not really experimental evidence-based association. So it all depends on -- in the case of infection, at least, infection is, you know -- in immunology, we talk about the dose and the magnitude of response. If you want an autoimmunity, you can inject, you know, a certain amount of antigen. You might not induce autoimmunity, and if you increase it by hundredfold, the it also induce the immunity using an adjuvant, a strong, powerful adjuvant. So the magnitude of immune response can be a hundred or a thousand times the stronger, so that can break the immune tolerance and cause an autoimmune response. So it can very in the individual if people are susceptible. But again, you would see markers relevant to that. That means, you know, the person who is receiving or the person who is infected would show autoimmune markers or a strong proinflammatory response prior to their showing symptoms of a particular condition.

Tr. 300–01. Dr. Vasu thus agreed that "different people can have different reactions to vaccines" based off of environmental and genetic factors. Tr. 301.

On cross examination, Dr. Vasu admitted that "changes in autoreactive T and B cell homeostasis [can] be induced by non-adjuvanted vaccines." Tr. 305. He explained that a "temporary change in the overall immune cell . . . is possible when you induced an immune

response to a particular antigen, irrespective on the cells present in her system that are antigen specific or not." *Id.* For IgM antibodies, Dr. Vasu opined it would take seven to 14 days for a peak response, but that an "[i]mmediate hypersensitivity shouldn't take too long . . . within a day or immediate. . . . [B]ut, you know, that is not an antigen-specific response." *Id.* Dr. Vasu was asked about the 2012 Institute of Medicine ("IOM") report that explained that secondary exposure to a vaccine "will usually" cause the development of an immune response to be shorter. Tr. 306. Dr. Vasu explained that this was in reference to cytokine production, which the article stated would take one to three days. *Id.* He also stated this would include both T and B cells, and that B cells "would start producing the antibodies within three days, and you should get a significant amount of antibodies produced within five days if it is a memory response." Tr. 307. However, Dr. Vasu maintained his position that someone would not be able to show symptoms of SFN within three days based on this mechanism. *Id.*

Dr. Vasu was also asked about Petitioner's 25-year history of Hashimoto's disease, which he admitted was "controlled." Tr. 308. He stated that he was not "able to explain the pathophysiological mechanism of hypothyroid disease leading to [SFN]," and that his opinion was based on the literature filed. *Id.* He was also asked about Lehmann et al.'s statement that given a two-week onset of GBS after flu infection, causality could not be inferred from symptom onset a few days after vaccination. Tr. 310. Specifically, Dr. Vasu was asked why he did not address the article's continuation of this point, which stated that "[t]here is no consensus on how small that number should be. Furthermore, the pathogenesis of post-vaccination GBS is still unclear, and more rapid and qualitatively different secondary immune responses might contribute to GBS after vaccination." Tr. 310–11 (quoting Resp't's Ex. C, Tab 6 at 4). Dr. Vasu admitted this statement reflected that the "authors don't really know how quickly it can happen." Tr. 311.

I asked Dr. Vasu how he would handle autoimmune diseases that were seronegative, given his arguments regarding Petitioner's lack of antibodies. Tr. 313. He stated that "in most cases, there is no auto-antigen implicated or fully identified, [he] would say, and the response is probably a secondary response. And so [] it depends on the clinical criteria." Tr. 314. In the case of autoimmune SFN via molecular mimicry, Dr. Vasu opined that "you expect an immune response against an antigen, either a T cell response or B cell response." *Id.* In cases where the antibody to test for is unknown, he opined that "it is almost impossible for us to state molecular mimicry as the mechanism [] because almost every antigen used in a vaccine is probably against both antigens and peptides." Tr. 315.

## VI. Applicable Legal Standards

To receive compensation under the Vaccine Act, a petitioner must demonstrate either that: (1) the petitioner suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as modified by 42 C.F.R. § 100.3; or (2) that the petitioner suffered an "off-Table injury," one not listed on the Table, as a result of her receiving a covered vaccine. *See* § 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006). In this case, Petitioner does not allege a Table injury, and thus Petitioner must prove by preponderant evidence that her injury was caused-in-fact by a Table vaccine.

### A. Factual Issues

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejection the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 538 (2001) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance").

There are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting *Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (Fed. Cl. 1991)). Ultimately, a determination regarding a witness' credibility is needed when determining the weight that such testimony should be afforded. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Valenzuela v. Sec'y of Health & Hum. Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng. v. Sec'y of Health & Hum. Servs.*, No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by them.").

### B. Causation-In-Fact

To establish causation-in-fact, a petitioner must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. § 300aa-13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321–22 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999).

In the seminal case of *Althen v. Sec'y of Health & Hum. Servs.*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. *See* 418 F.3d 1274, 1278–79 (Fed. Cir. 2005). The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the

injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *Id.* "[C]lose calls regarding causation are resolved in favor of injured claimants." *Id.* at 1280. Further, evidence used to satisfy one prong of the test may overlap to satisfy another prong. *Capizzano*, 440 F.3d at 1326.

Under the first prong of *Althen*, a petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *See Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. den'd*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548–49. Petitioners are not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge[] the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano*, 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278–81; *see also Moberly*, 592 F.3d at 1322. However, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Indeed, the Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019) (citing *Moberly*, 592 F.3d at 1322; *LaLonde*, 746 F.3d at 1339). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322. In general, "the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." *LaLonde*, 746 F.3d at 1339.

Furthermore, establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of her claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). The Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* requires that courts determine the reliability of an expert opinion before it may be considered as evidence. 509 U.S. 579 (1993). However, in the Vaccine Program, the *Daubert* factors are used in the weighing of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("[U]niquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to the persuasiveness of expert testimony already admitted."); *see also Cedillo v. Sec'y of health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). Under *Daubert*, the

> Factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or

> potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

The *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The factors do not "constitute a 'definitive checklist or test'" and may be applied differently depending on the facts of a particular case. *Id.* at 150 (quoting *Daubert*, 509 U.S. at 593).

"In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establish a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590 (citation omitted). Thus, for Vaccine Act claims, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Synder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also D'Tiole v. Sec'y of Health & Hum. Servs.*, No. 15-085V, 2016 WL 7664475, at *24 (Fed. Cl. Spec. Mstr. Nov. 28, 2016) (stating that the Vaccine Act "require[s] a chain of reliable propositions supporting [a] petitioner's theory").

Under the second prong of *Althen*, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418 F.3d at 1279. The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the vaccination." 2004 WL 1717359, at *4 (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (citation omitted). Nevertheless, "[r]equiring epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibly raises a claimant's burden under the Vaccine Act and hinders the system created by Congress . . . ." *Capizzano*, 440 F.3d at 1325–26. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen* 418 F.3d at 1280.

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). Indeed, when reviewing the record, a special master must consider the opinions of treating physicians. *Capizzano*, 440 F.3d at 1326. This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally

contemporaneous to the medical events." *Cucuras*, 993 F.2d at 1528. However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby*, 997 F.3d at 1383 (finding that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition). While a special master must consider these opinions and records, they are not "binding on the special master or court." § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting with testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *LaLonde v. Sec'y of health & Hum. Servs.*, 110 Fed. Cl. 184, 203 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to finger causation-in-fact." *de Bazan v. Sec'y of health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

Although a temporal association alone is insufficient to establish causation, under the third prong of *Althen*, a petitioner must show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d at 1278. The special master cannot infer causation from temporal proximity alone. *See Thibaudeau v. Sec'y of health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Grant*, 956 F.2d at 1148 ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period . . . [w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983))).

A petitioner who satisfies all three prongs of the *Althen* test has established a prima facie showing of causation. *Hammitt v. Sec'y of health & Hum. Servs.*, 98 Fed. Cl. 719, 726 (2011). A petitioner who demonstrates by a preponderance of the evidence that she suffered an injury caused by vaccination is entitled to compensation unless the respondent can demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to the vaccination. *See Althen*, 418 F.3d at 1278; *Knudsen*, 35 F.3d at 547. In such a case, the government must not merely prove the existence of an alternative cause, but that such an alternative actually caused the injury. *Kundsen*, 35 F.3d at 549. Consequently, when and if the petitioner establishes a prima facie case, the burden the shifts to the government to prove that an alternative cause, unrelated to the

administration of the vaccine, was the "sole substantial factor" in causing the alleged injury. *See de Bazan*, 539 F.3d at 1354; *see also Hammitt*, 98 Fed. Cl. at 726 (explaining that respondent's burden is to show that the "factor unrelated" was the "sole substantial factor" in causing the injury). Additionally, a factor unrelated "may not include 'any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition.'" § 300aa-13(a)(2); *see also Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349 (Fed. Cir. 2010) (stating that an idiopathic diagnosis cannot be a "factor unrelated," as it is idiopathic).

## VII. Analysis

### A. Diagnosis

In cases where the diagnosis is contested, "special masters may find whether a preponderance of evidence supports any proposed diagnosis before evaluating whether a vaccine caused that illness." *Hibbard v. Sec'y of Health & Hum. Servs.*, No. 07-446V, 2011 WL 1766033, at *6 (Fed. Cl. Spec. Mstr. Apr. 12, 2011) (citing *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1345–46 (Fed. Cir. 2010)). In this case, diagnosis is in dispute, so it is appropriate to address it first. For the following reasons, I find there is preponderant evidence to show that Petitioner suffered from SFN.

The primary dispute regarding Petitioner's diagnosis is whether she suffered from SFN, as diagnosed by her treating neurologist, or whether she suffered from a psychiatric condition such as conversion disorder, somatization, or malingering, as opined by workers' compensation psychiatrist Dr. Ziv and Respondent's neurology expert, Dr. Callaghan. As explained by the judge presiding over Petitioner's workers' compensation claim, Dr. Ziv examined Petitioner in the context of pending litigation. There is no evidence in this record that Dr. Ziv considered any other explanations for Petitioner's cognitive and psychiatric symptoms, such as whether they were side effects of her medication. *See* Pet'r's Ex. 14-7 at 127–28. The judge also noted that Petitioner's mental health complaints had "largely improved or subsided" at the time of the hearing, "suggesting that they were not the primary problem." *Id.* at 127. This reasoning is supported by the medical record, which documents Petitioner's course of treatment and the improvement of these symptoms, while her neurological symptoms persisted. Further, Petitioner's treating psychiatrist, Dr. Wiley, saw Petitioner outside the context of litigation and throughout her clinical progression, and at no time did she believe that Petitioner suffered from conversion disorder, somatization, or malingering. In fact, Dr. Wiley testified to the contrary at Petitioner's workers' compensation hearing. *See* id. at 123 (noting Dr. Wiley "vehemently" disagreed with Dr. Ziv's diagnosis and believed that the surveillance from the workers' compensation investigation "substantially increased [Petitioner's] anxiety"). Given the organic, contemporaneous, and continuous nature of Dr. Wiley's treatment of Petitioner, when compared to Dr. Ziv's single examination several months post onset and for the purpose of litigation, I find Dr. Wiley's assessment to be more reliable than Dr. Ziv's opinion.

Dr. Callaghan shared Dr. Ziv's opinion, but he is a neurologist with a specialty in neuromuscular, metabolic, and diabetic neuropathies. *See generally* Resp't's Ex. E. He is not a psychiatrist, and although he is board-certified by the American Board of Psychiatry and Neurology, his specialty is listed as "Neurology," not psychiatry. *Id.* at 1. The only mentions in his CV regarding work or publications related to psychiatry are two articles titled "Executive Functioning in Extreme Obesity: Contributions from Metabolic Status, Medical Comorbidities, and Psychiatric Factors" and "Neuropsychological Outcomes in Individuals With Type 1 and Type

2 Diabetes," both of which list Dr. Callaghan as a co-author. *See id.* at 25–26. Although Dr. Callaghan testified to his experience with patients who suffer from psychiatric conditions, he questioned Petitioner's request to remain on leave from work based on an SFN diagnosis. Dr. Callaghan did not believe that an SFN diagnosis would qualify someone for disability. He acknowledged the variety of symptoms that can be associated with SFN, calling them nonspecific. However, he asserted that these symptoms, including fatigue and deep aching, would not warrant leave from work. Dr. Callaghan, like Dr. Ziv, provided his opinion in the context of litigation. Given his lack of expertise as it relates to the diagnosis of psychiatric conditions, I do not find that Dr. Callaghan provided sufficient support for his opinion that her treaters "got it wrong" by not including a psychiatric diagnosis as a potential differential. Tr. 263–64. On the contrary, Petitioner provided the most reasonable explanation, stating that she felt she had "an invisible disease" and that "[e]veryone told her to calm down," increasing her anxiety. Pet'r's Ex. 14-2 at 141.

As for whether Petitioner suffered from SFN, apart from his reliance on Dr. Ziv's opinion, Dr. Callaghan did not provide an alternative diagnosis for Petitioner. Instead, he relied on one set of diagnostic criteria provided by Devigili et al., which he argued Petitioner did not meet, to opine that she did not suffer from SFN. However, the existence of diagnostic criteria in the Devigili et al. article, and whether Petitioner fits them, does not end the analysis. First, the authors themselves admitted that "the diagnostic criteria for SFN are yet to be fully established." Resp't's Ex. A, Tab 3 at 2. Second, Dr. Callaghan ignored the fact that the authors provided two different sets of criteria for the diagnosis of SFN. *Id.* The first, the Besta criteria, developed by the authors in 2008, is what Dr. Callaghan relied on to argue that Petitioner did not meet a diagnosis of SFN. *See id.* The second criteria, which Dr. Callaghan did not discuss, is within the revised guidelines of the Diabetic Neuropathy Study Group of the European Association for the Study of Diabetes. *Id.* These criteria are listed on a graded scale, from "possible" to "definite," and are as follows:

> (i) possible, if symptoms or clinical signs of small fib[er] damage, or both; (ii) probable, if clinical signs of small fib[er] damage, and normal sural NCS; and (iii) definite, if clinical signs of small fib[er] damage, normal sural NCS, and abnormal QST thresholds at the foot or reduced IENFD at the ankle, or both.

*Id.* Petitioner did not undergo QST testing, and her IENFD was found to be abnormal in her thigh, but not in her distal leg. However, as admitted by Dr. Callaghan and noted by Dr. Kolb, as well as Petitioner's treating physicians, she did display symptoms and clinical signs of small fiber damage and her EMG/NCS testing was normal. Thus, according to these criteria, Petitioner would be considered to have "probable" SFN. Id. Furthermore, although it was argued that the Devigili et al. article did not differentiate between non-length-dependent and length-dependent SFN, the authors noted that they only included individuals who "where age >18 years and symptoms suggesting sensory peripheral neuropathy (positive and/or negative symptoms ***with length-dependent distribution at lower limbs and autonomic symptoms***) not otherwise explained." *Id.* at 3 (emphasis added). Thus, it is unclear what value an exclusion based on diagnostic criteria designed for length-dependent SFN would have for a patient who presents with non-length-dependent SFN, as the latter presents with markedly different symptoms. The authors of Devigili et al. wrote this paper with the express purpose of comparing the two sets of criteria, in part to determine "the most reliable approach to individual patients suspected to have SFN." *Id.* They ultimately found that their "results showed [] a strict agreement between the two diagnostic approaches." *Id.* at 7. The authors concluded that "to increase the reliability of the diagnosis . . . patients should be suspected to have SFN when at least two clinical signs are present. . . . Quantification of IENFD remains the most reliable tool to confirm the diagnosis." *Id.* Based on

this conclusion from Devigili et al., Petitioner's reduced IENFD in her thigh could confirm a diagnosis of SFN.

This reasoning is in line with that of Petitioner's treating physicians, particularly Petitioner's primary neurologist, Dr. Varrato. Although Petitioner's treating physicians initially suspected she suffered from GBS, Dr. Varrato eventually began to suspect Petitioner suffered from SFN, a diagnosis that is supported by the medical record. At Petitioner's initial presentation, Dr. Varrato explained that EMGs and lumbar punctures can be normal in GBS patients if testing is done early, and thus he ordered a repeat EMG. *See* Pet'r's Ex. 5 at 41. When Petitioner returned on February 23, 2018, Dr. Varrato explained that her EMG was normal, and then ordered MRIs of her brain and cervical spine to rule out issues with the CNS. *Id.* at 60. Following the normal results of this imaging, on April 9, 2018, Dr. Varrato continued to opine that Petitioner may have "slow to improve sensory GBS with no evidence of large fiber involvement." *Id.* at 70. By May 23, 2018, Dr. Varrato began to question this diagnosis given the length of time her symptoms persisted and considered the possibility of acute SFN. *Id.* at 81. A biopsy of Petitioner's left thigh and left calf confirmed Dr. Varrato's diagnosis of "non-length dependent [SFN]," which remained on her differential diagnosis throughout the course of her treatment. *Id.* at 103.

Further, the literature regarding the presentation of non-length dependent SFN supports Petitioner's diagnosis. Gorson et al. reviewed 23 patients with non-length dependent SFN, where the authors specifically noted a "pattern of symmetric, non-length dependent neuropathic pain with face and trunk involvement." Pet'r's Ex. 28 at 1. The authors described non-length dependent SFN as "neuropathic pain and pure or predominantly small fib[er] sensory loss involving proximal regions of the limbs, face and trunk, either sparing the acral extremities or with simultaneous involvement of distal and proximal areas in a non-length dependent pattern." *Id.* Eight of the 23 patients had an acute onset of symptoms "over days" and 12 involved symptoms on their face. *Id.* at 1–4. Ten patients had an onset of symptoms in their face or hands before the legs. *Id.* at 4. None of the patients had limb weakness, gait ataxia, or Romberg sign. *Id.* at 5. The authors also listed the flu vaccine as a precipitating factor for one of the patient's SFN. *Id.* at 6. In discussing the commonalities between the patients, the authors speculated that SFN could be related to "selective dysfunction of the dorsal ganglia cells subserving small nerve fib[er]s," due to the following factors:

> (1) bilateral distribution with early and prominent involvement of proximal regions, especially the face and tongue, or the hands before or simultaneously with the legs and feet in a non-length dependent distribution; (2) relative sparing of large nerve fib[er]s; (3) skin biopsy specimens corroborating a non-length dependent pattern of [IENFD] loss in proximal sites of the thigh or forearm, sparing the calf or simultaneous involvement of proximal and distal sites []; and (4) a slowly progressive course, perhaps suggesting loss of small dorsal root ganglia.

*Id.* The authors also noted that these findings "can be distinguished clinically from the common variety of length dependent, distal SFN." *Id.* Due to non-length dependent SFN's "peculiar distribution and paucity of neurological findings, many of our patients were previously considered to be narcotic seeking or have a somatization disorder or another psychiatric illness as an explanation for their symptoms." *Id.* at 7. To combat this, the authors stated that skin biopsies provide "objective evidence of small nerve fib[er] involvement." *Id.* These findings closely mirror Petitioner's presentation, who experienced an onset of her symptoms within days, associated with her face and hands before spreading to her legs, and whose peculiar presentation led Dr. Ziv and

Dr. Callaghan to believe there was a psychiatric component to her condition. Although Petitioner did report complaints of weakness and gait imbalance, she attributed this to her inability to feel her feet making contact with the ground. *See* Tr. 34. Respondent did not engage with this statement, but rather argued that the mere fact of gait imbalance and weakness is sufficient to exclude a diagnosis of SFN based off the Besta criteria referenced by Devigili et al. However, as discussed above, these criteria were used to asses patients with length-dependent SFN, and not non-length dependent SFN. I thus do not find them applicable here to exclude a diagnosis of SFN, particularly where Petitioner's presentation mirrors that of the non-length dependent patients discussed in Gorson et al.

Respondent's final argument regarding diagnosis is that Petitioner's symptoms of "uncontrollable shaking of her right arm, fatigue, emotional distress, blurred vision, dizziness, anxiety, panic attacks, whole body pain, palpitations, lightheadedness, and shortness of breath" cannot be explained by SFN; thus, Petitioner must not have SFN. Resp't's Response at 17. However, this assertion ignores the facts surrounding these symptoms. Petitioner attributed her dizziness, lightheadedness, and shortness of breath to her gabapentin early in her progression before seeing Dr. Varrato. *See* Pet'r's Ex. 5 at 22, 24. Petitioner also stated several times that the course of her disease and the effect it was having on her life was the reason for much of her anxiety and depression, which was echoed by her treating psychiatrist Dr. Wiley. Pet'r's Ex. 14-2 at 142. Lastly, Petitioner reported that her paresthesias was making her unable to sleep at night, which reasonably would have contributed to her symptoms of fatigue. Given all of these explanations, and that Petitioner's presentation fits quite uniformly with the literature's description of non-length dependent SFN, I find there is preponderant evidence in the record that Petitioner suffered from non-length dependent SFN.

### B. *Althen* Prong One

Under *Althen* prong one, Petitioner must set forth a medical theory explaining how the received vaccine could have caused or sustained injury. *Andreu*, 569 F.3d at 1375; *Pafford*, 451 F.3d at 1355–56. Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. *Boatmon*, 941 F.3d at 1359; *see also Knudsen*, 35 F.3c at 548; *Veryzer v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 214, 223 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"), *aff'd* 475 F. App'x 765 (Fed. Cir. 2012). If Petitioner relies upon a medical opinion to support her theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. *See Broekelschen*, 618 F.3d at 1347 ("The special master's decision oftentimes is based on the credibility of the experts and the relative persuasiveness of their competing theories"); *Perriera v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing *Fehrs v. United States*, 620 F.2d 255 (Ct. Cl. 1980))). Importantly, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde*, 746 F.3d at 1339. Instead, Petitioner must show it was more likely than not that the vaccine caused the condition alleged. *Id.*

Dr. Kolb presented several theories[36] as to how Petitioner's flu vaccine could have caused her SFN, but he primarily focused his discussion on molecular mimicry. Because Dr. Kolb did not provide sufficient detail to discuss his other proposed mechanisms, I will similarly limit my discussion to his theory of molecular mimicry. However, for the reasons discussed below, I find his theory insufficient to satisfy the requirements of *Althen* prong one.

Dr. Kolb explained that molecular mimicry occurs when a "foreign peptide causes an activation of T or B cells which then subsequently attacks the peptides of the body itself." Pet'r's Ex. 26 at 7. To support his account of how vaccines can cause autoimmunity in this manner, he cited to Agmon-Levin et al., an article co-authored by Yehuda Shoenfeld and which discussed the theory of "autoimmune/inflammatory syndrome induced by adjuvants," or ASIA. Pet'r's Ex. 19 at 1. ASIA was presented regularly in the Program for many years without success, and to date, it has been consistently rejected as a valid theory connecting vaccines to injury. *See D'Angiolini v. Sec'y of Health & Hum. Servs.*, 122 Fed. Cl. 86, 101 (affirming the special master's rejection of the theory as "still developing and incomplete), *aff'd* 645 Fed. Appx. 1002 (Fed. Cir. 2016); *Garner v. Sec'y of Health & Hum. Servs*., No. 15-0063V, 2017 WL 1713184, at *15 (Fed. Cl. Spec. Mstr. Mar. 24, 2017); *Johnson v. Sec'y of Health & Hum. Servs.*, No. 10-0578V, 2016 WL 4917548, at *8–9 (Fed. Cl. Spec. Mstr. Aug. 18, 2016) (describing this theory as overbroad, generalized, and vague and finding this expansive theory logically unpersuasive); *Rowan v. Sec'y of Health & Hum. Servs.*, No. 10-0272V, 2014 WL 7465661, at *12 (Fed. Cl. Spec. Mstr. Dec. 8, 2014). While Petitioner's Fluzone vaccine ultimately did not contain an adjuvant, Dr. Kolb's continued discussion of adjuvants (and the fact that he was not aware Petitioner's vaccine did not contain an adjuvant until he was asked on cross examination at the entitlement hearing) makes his opinions significantly less credible in the eyes of the Court.

Throughout Dr. Kolb's reports and testimony, he opined that Petitioner had SFN and did not have sensory GBS, however, much of his argument regarding the vaccine's causal mechanism centered on articles which discussed SFN as a variant of sensory GBS. *See* Pet'r's Ex. 26 at 3 ("Dr. Callaghan raises the point that [Petitioner] does not have sensory GBS given the [two] normal EMGs and I fully agree."); Tr. 155 (Dr. Kolb testifying that Petitioner had "post-vaccination [SFN]," but that "there is mounting evidence that . . . acute onset [SFN] could be a . . . form of sensory GBS, but [his ] expert opinion is that she has acute onset [SFN]"). Dr. Kolb himself appeared to recognize this contradiction in his reports, and he argued that whether "we label it small fiber GBS or acute onset [SFN] in response to a stimulus (vaccine) is medically immaterial and a matter of semantics." Pet'r's Ex. 15 at 6. That Dr. Kolb appeared to state Petitioner suffered from SFN and not a sensory variant of GBS, but then relied heavily on literature discussing SFN as a sensory variant of GBS, and dismissed the existence of a distinction between the two, muddles his own opinion regarding causation, which undermines the theory he presents regarding *Althen* prong one.

A substantial portion of the literature cited by Dr. Kolb to support his theory is in relation to GBS following flu vaccine, and the molecular mimicry that occurs to cause this condition. While Respondent's expert, Dr. Vasu, contested whether the flu vaccine can cause GBS via molecular mimicry, or at all, given the presence of flu/GBS on the Vaccine Table, I am not inclined to litigate the merits of that discussion further. Rather, Dr. Kolb's theory begins to break down in his attempt

---

[36] As noted by Respondent, on more than one occasion, Dr. Kolb appeared to invoke the theory of "autoimmune/inflammatory syndrome induced by adjuvants," or ASIA, in support of his medical causation theory.

to link SFN to GBS. As mentioned above, this is in spite of the fact that Dr. Kolb has opined that Petitioner does not have a sensory variant of GBS; thus, his invocation of this literature deems him less credible in the eyes of the Court. However, in addition to this issue, the literature cited by Dr. Kolb does not align with the facts presented in this case, nor does it support the notion that the distinction between sensory GBS and SFN is "immaterial."

Dr. Kolb relied primarily on three articles to support his argument that acute SFN is a form of sensory GBS: Gemignani et al., Yuki et al., and Uncini & Yuki. However, none of these articles support a finding that all forms of SFN are sensory GBS or that SFN involves the same pathological mechanisms as GBS. The first, Gemignani et al., reviewed non-length dependent SFN as a whole and discussed a "SFN variant of [GBS]" as a possible form of SFN, alongside treatment-induced neuropathy of diabetes, idiopathic SFN, and SFN following vaccination. Pet'r's Ex. 21 at 5–6. The article provided no meaningful discussion of either SFN as a GBS variant or vaccination-induced SFN, just that both had been "proposed." *Id.* at 6.

The second article, Uncini & Yuki, was written in 2012, and examined sensory GBS and other related disorders. Pet'r's Ex. 44 at 1. The authors stated their purpose of the article was to define sensory GBS due to "reports [of] different clinical presentations and electrophysiological findings [that] are variously named," which caused "terminological and nosological confusion." *Id.* Patients with acute sensory neuropathy and electrophysiological evidence of demyelination have been suspected of having a sensory form of GBS, while patients with "an acute small-fiber sensory neuropathy, increased [CSF], normal reflexes, and normal motor sensory conduction studies were believed to have a possible GBS variant." *Id.* The authors then split these two presentations into two categories: acute sensory demyelinating polyneuropathy ("ASDP") and acute sensory small fiber neuropathy-ganglionopathy ("ASFNG"). *Id.* at 2–4. For ASDP, or sensory GBS, the authors reviewed 22 patients who experienced acute onset paresthesias, ataxia, no weakness, and a peak of symptoms within four weeks. *Id.* at 2. EMG/NCS testing showed evidence of demyelination in in the majority of patients. *Id.* Because of these symptoms being largely limited to the sensory fibers, the authors created the term ASDP. *Id.* However, Petitioner does not meet the criteria for ASDP due to her normal EMG/NCS studies and weakness.

The authors then explained ASFNG. In contrast to ASDP, the 10 ASFNG patients experienced an acute onset of numbness or burning in their extremities, reaching a peak in six weeks. Pet'r's Ex. 44 at 4. Five patients reported a preceding illness, and all patients showed normal strength, distal sensory loss, and normal proprioception. *Id.* Of the seven patients tested, six had elevated CSF. *Id.* All electrophysiological testing was normal. *Id.* The authors opined that "the rapid onset, increased CSF protein level, and the disease course suggest that this disorder is related to GBS." *Id.* The authors also considered the possibility of "post-vaccination GBS involving small fibers," as five of the 10 patients included in their study were from Souayah et al., a series of five case reports detailing the onset of SFN following rabies, varicella, and Lyme disease vaccinations. *Id.*; *see generally* Pet'r's Ex. 17. However, Petitioner does not match the presentations of the patients discussed in these articles. Petitioner did not have elevated CSF nor did she report an antecedent illness. Further, the patients reviewed by the authors experienced a length-dependent pattern of SFN, while Petitioner's SFN was non-length dependent. In fact, the only characteristic Petitioner shared with the criteria given by the authors was an acute onset of symptoms and the involvement of small fibers, albeit in a different presentation.

Further, the patients included by Uncini & Yuki from Souayah et al. do not provide sufficient comparisons for Petitioner's case, as the article discussed SFN occurring in temporal

relationship rabies, varicella, and Lyme disease vaccinations, not flu vaccination. *See* Pet'r's Ex. 17 at 1. This distinction is noteworthy because the article detailed five patients, none of which mirror Petitioner's clinical presentation. Petitioner was vaccinated on October 6, 2017, and reported she experienced a tapping-sensation on her face within two days of vaccination; five days post-vaccination, Petitioner added numbness, tingling, and weakness in her arms and legs. For comparison, Patient One from Souayah et al. "received [the] rabies vaccine over three days within a one-week period[, and s]everal hours after the second injection, he developed burning paresthesias." *Id.* Patient Two "developed burning and itching sensations . . . one day after a [Lyme disease] vaccination" that incompletely resolved but "then returned more intensely one year later, immediately following a second LYMErix vaccination." *Id.* at 1–2. Patient Three also received two Lyme disease vaccines, developing flu-like symptoms after the first one and "severe, sharp stabbing" chest pains "approximately one week after the second injection," administered one month later. *Id.* at 2. Patient Four developed headaches and neck stiffness "a few days after receiving" vaccinations for Lyme disease and hepatitis A with neuropathic symptoms developing in subsequent weeks. *Id.* The final patient studied by Souayah et al. developed progressive "numbness and hyperesthesias in all extremities about two months following a second [varicella zoster] vaccine." *Id.* These cases, involving different vaccines and symptoms following a second vaccine dose or multiple vaccines at once, do not provide a roadmap that is consistent with Petitioner's symptom onset: tapping on the left side of her face two days post vaccination, followed by general paresthesias and weakness after five days. Tr. 19–20. Given that Petitioner's presentation differed substantially from all ten of the ASFNG patients reviewed by Uncini & Yuki, I do not find that this article provides reliable evidence that Petitioner's SFN was a form of sensory GBS.

The third article, Yuki et al., was written in 2017, five years after Dr. Yuki co-authored the article discussed above. Pet'r's Ex. 41 at 1. It described three patients with SFN "weeks after a preceding infectious illness." *Id.* All three patients presented with impaired pinprick sensation, brush allodynia in a stocking-glove distribution, autonomic symptoms, normal NCS testing of their bilateral median, ulnar, peroneal, tibial sensory, and motor nerves, normal CSF, and decreased or absent deep tendon reflexes. *Id.* at 1–2. The authors opined that the reduced reflexes "were likely a result of the spinal root inflammation common to [GBS] and its variants such as Fisher Syndrome." *Id.* at 4. In comparing their cases to the literature, the authors noted that "[s]ome authors have used the term acute [SFN] to describe these patients and have proposed this as another variant of [GBS]." *Id.* However, they cautioned that "[t]raditionally, [GBS] is a neuropathy restricted to the large motor-sensory fibers, divided into demyelinating and axonal forms." *Id.* Given this distinction, the authors opined that such cases of acute SFN may "exhibit similarities to [GBS]," but that "[a] factor outside of the scope of traditional [GBS] would be the positive response to corticosteroids." *Id.* at 4–5. The authors concluded by suggesting that acute SFN was "a different disease entity" from GBS due to the fact that not all patients with acute SFN following infection or vaccination "complain of pain." *Id.* at 5. It is notable that despite Dr. Yuki's creation of a category of SFN that he believed to be related to SFN, he did not believe this presentation fit within ASFNG or as a GBS variant generally. Instead, the authors opined that such a presentation was a different disease entity than GBS entirely. And it is this description that most closely resembles Petitioner's symptoms. Petitioner experienced impaired pinprick sensation, autonomic symptoms, normal EMG/NCS studies and CSF, and decreased deep tendon reflexes, in addition to her reduced IENFD in her thigh. This would appear to align with the description of the authors, who recognized that while such a presentation carries similarities to GBS, it is in fact a different entity altogether.

Another article discussed by Dr. Kolb at the hearing, Seneviratne & Gunasekera, further supports the distinctions made by Dr. Yuki in both of his articles. *See* Pet'r's Ex. 30. The authors here also considered some cases of acute SFN to be variants of GBS where there was evidence of "acute onset symmetric sensory loss, progression up to [four] weeks, diminished or absent reflexes, normal muscle power, electrophysiological evidence of demyelination in at least two nerve, monophasic course, no alternative cause for neuropathy, no family history of neuropathy, and increased CSF protein." *Id.* at 2. Here, Petitioner meets only four of the diagnostic criteria, below the six or seven the authors recommend before considering the diagnosis to be a sensory variant of GBS. *Id.* at 3. This unties the portions of Dr. Kolb's theory that rely on GBS pathogenesis to explain the development of SFN following vaccination.

The case reports cited by Dr. Kolb are also insufficient to meet Petitioner's burden. As discussed above, Souayah et al. involves different, multi-dose vaccines administered to patients with different presentations than the facts of Petitioner's case. Kafaie et al. identified a petition in the Program at the time of their report that alleged the flu vaccine caused a petitioner to develop SFN; however, they noted that the "petition alone cannot be used to assess relationship between vaccination and SFN. At this time, there is no conclusive evidence to suggest the association between [flu] vaccine and SFN." Pet'r's Ex. 23 at 2. The other case report identified by Dr. Kolb, Waheed et al., documented a patient with SFN with symptom onset occurring one week following the second dose of a COVID-19 vaccine. Pet'r's Ex. 25 at 1. Key distinctions between the case study patient and Petitioner include different vaccines that require two doses versus one dose, respectively, and the lack of any early-presenting flu-like symptoms. Dr. Kolb did not account for the differences or explain how they are similar. Furthermore, the authors of Waheed et al. denied the role of molecular mimicry in their case and stated that "the lack of significant homology between any SARS-CoV-2 genetic or linear protein structure and human linear protein structures in this study make molecular mimicry as a cause less likely." *Id.* at 1–2. Instead, they proposed "an immune-mediated hypersensitivity to the solvent/adjuvant." *Id.* at 1. As discussed above, Petitioner's flu vaccine did not contain an adjuvant.

Full consideration of the filed literature leaves Dr. Kolb's theory a threadbare discussion of molecular mimicry and a handful of case reports discussing SFN following unrelated vaccinations. Dr. Kolb's discussion of molecular mimicry appears to rely heavily on a connection between the flu vaccine's development of GBS via molecular mimicry, however, he did not explain the relevance of how a disease process characterized by the demyelination of large fibers would relate to SFN, a disease that is not characterized by demyelination and involves the small fibers. Further, Dr. Kolb did not provide any potential sequence or structural homology between any portion of the flu vaccine and the human body to facilitate this molecular mimicry, or any other evidence discussing SFN following flu vaccination via molecular mimicry. In fact, the only portion of the vaccine that Dr. Kolb ever discussed at length is a potential adjuvant that may stimulate the immune system. However, as he admitted at the hearing when confronted, Dr. Kolb was not aware that Petitioner's Fluzone vaccine did not contain an adjuvant. Tr. 177.

In sum, Dr. Kolb's attempts to invoke the ASIA theory of causation coupled with molecular mimicry do not provide a sound and reliable medical or scientific explanation to satisfy Petitioner's burden under *Althen* prong one. Petitioner has not provided preponderant evidence that the form of SFN consistent with Petitioner's presentation is a form of GBS. Furthermore, assuming that to be true, the record lacks preponderant evidence that they share the same or similar causal mechanisms to relate to the development of typical GBS following flu vaccination. Petitioner has also not presented preponderant evidence linking SFN to the flu vaccine generally. Although

Petitioner is not required to present any specific form of evidence to satisfy her burden, she must present *some* evidence that brings her theory from beyond "plausible" to "more likely than not." *See LaLonde*, 746 F.3d at 1339 (citing *Moberly*, 592 F.3d at 1322). Petitioner has failed to do so and thus has failed to satisfy her burden under *Althen* prong one.

### C. *Althen* Prong Two

Under *Althen* prong two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Capizzano*, 440 F.3d at 1324 (quoting *Althen*, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" *Pafford*, 451 F.3d at 1356 (internal citations omitted). This includes instances where an action is "a substantial factor in bringing about the harm, and that the harm would not have occurred but for that action." *Shyface*, 165 F.3d at 1365 (internal citations omitted). The Federal Circuit has explained that in such cases, "while the vaccination must be a substantial factor in the [injury], it need not be the sole factor or even the predominate factor." *Pafford*, 451 F.3d at 1357.

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause-and-effect show[s] that the vaccination was the reason for the injury.'" (quoting *Althen*, 418 F.3d at 1280)). Medical records are generally viewed as trustworthy evidence, since they are created contemporaneously with the treatment of the vaccinee. *Curcuras*, 993 F.2d at 1528. Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano*, 400 F.3d at 1325. Instead, Petitioner may satisfy her burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325–26.

A successful argument pursuant to *Althen* prong two is heavily dependent on a reliable causation theory. Petitioner's inability to meet her burden demonstrating how the flu vaccine can cause SFN effectively precludes her from being able to show that her symptoms were actually caused by the vaccine according to said theory. This hinders any meaningful discussion on prong two.

It is true that Petitioner's treating physicians, particularly Dr. Varrato, opined that her flu vaccine may have caused her SFN. However, the extent of Dr. Varrato's explanation of this mechanism was that "[a]fter extensive testing and evaluation [he] concluded the [SFN] was autoimmune in etiology. Given the temporal relationship to the flu vaccine administration, and the fact she had a non-length dependent [SFN], it is my professional opinion that [Petitioner] has variant sensory GBS/post[-]vaccination [SFN] due to the flu vaccine." Pet'r's Ex. 29 at 1. Dr. Varrato did not explain why the nature of Petitioner's non-length dependent SFN would factor into his reason to attribute it to the flu vaccine or how Petitioner's disease progression was autoimmune in nature. Further, prior to Petitioner's SFN diagnosis in May 2018, her providers linked the flu vaccine to her condition due to her then running diagnosis of GBS, which has a more established link to the flu vaccine. *See* Pet'r's Ex. 4 at 54 (Dr. Sheen noting a concern for GBS due to the recent flu shot and numbness symptoms); Pet'r's Ex. 12 at 20 (VAERS report for the flu vaccine

with a "tentative diagnosis of [GBS]"). Although the decision of Petitioner's workers' compensation claim found that she suffered from "a sensory variant of [GBS] from the required flu vaccine," this Court is not bound by the decisions of workers' compensation claims. Pet'r's Ex. 14-7 at 127; *D'Angiolini v. Sec'y of Health & Hum. Servs.*, No. 99-578V, 2014 WL 1678145 (Fed. Cl. Spec. Mstr. Mar. 27, 2014) ("Although the judge denied [the] claim for workers' compensation benefits, [] the outcome in that forum has played no role in the evaluation of the evidence in this case.").

It is also persuasive that as discussed above, Petitioner's presentation does not match the examples provided in the literature of sensory GBS or ASFNG, nor does it match the presentations of the case reports of SFN following other vaccinations provided by Petitioner. The case study that Dr. Kolb relied on to illustrate this clinical presentation involved a patient who developed SFN following two doses of a COVID-19 vaccine. *See* Pet'r's Ex. 25. In that case, Petitioner was a 57-year-old female who presented one week after her second COVID-19 vaccine dose with "subacute onset of intense burning dysesthesias in the feet, gradually spreading to the calves and . . . hands, unaccompanied by other neurological [] symptoms." *Id.* at 1. The patient was treated with gabapentin, and her symptoms improved. *Id.* During her two-week follow-up, "she reported complete resolution of neuropathic pain," and discontinued her treatment. *Id.* Examination revealed however, that "stocking-type small fiber modality loss persisted." *Id.* This patient presented differently from Petitioner in all manner of ways. First, the former's symptoms occurred following the second dose of an adjuvanted COVID-19 vaccine, while Petitioner was injected once with a nonadjuvanted, single dose, flu vaccine. The case study patient did not present with symptoms in her face or arms. Instead, the case study patient's symptoms began with sensory distortion in her lower extremities. *Id.* at 1. The case study patient's symptoms also improved within a couple of weeks, whilst Petitioner continued to experience tingling in her upper and lower extremities over several months post vaccination. *See id.* Indeed, the differences between the case study and Petitioner's case culminate with the authors' conclusion that the cause of the case study patient's symptoms was likely a hypersensitivity to the adjuvant and not molecular mimicry. *Id.* at 1–2. Petitioner has failed to provide preponderant evidence of a logical sequence of cause and effect between her flu vaccination and her SFN.

### D. *Althen* Prong Three

*Althen* prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been defined as a "medically acceptable temporal relationships." *Id.* Petitioner must offer "preponderant proof that the onset of symptoms occurred within a time frame for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan*, 539 F.3d at 1352. The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under *Althen* prong one). *Id.*; *Koehn v. Sec'y of Health & Hum. Servs.*, 773 F.3d at 1239, 1243 (Fed. Cir. 2014); *Shapiro*, 101 Fed. Cl. at 542; *see Pafford*, 451 F.3d at 1358. A temporal relationship between a vaccine and an injury, standing alone, does constitute preponderant evidence of vaccine causation. *See, e.g., Veryzer*, 100 Fed. Cl. at 356 (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that [P]etitioner must posit a medical theory causally connecting the vaccine and injury").

Petitioner argues that her symptoms began three days after her flu vaccine, and that this represents a "proximate temporal relationship between the vaccination and injury." Pet'r's Br. at

21. However, Respondent asserts that Petitioner's symptoms began two days after vaccination. Resp't's Response at 22; Pet'r's Ex. 15 at 7. Dr. Kolb went as far as to argue that 24 hours would be a reasonable amount of time for Petitioner to begin to show symptoms based on how quickly "many of us experienced symptoms after [COVID]-19 vaccination." Pet'r's Ex. 15 at 8. He otherwise relied on the timing of the 1976 swine flu vaccine campaign discussed in Schonberger et al., as well as the case studies from Souayah et al., to explain the possibility for onset. However, as discussed above, Petitioner has not established how evidence relating to GBS pathogenesis relates to her SFN, and the factors surrounding the vaccines discussed in Souayah et al. are substantially different than those in the present case. Thus, Petitioner has failed to satisfy her burden pursuant to *Althen* prong three.

## VIII. Conclusion

For the reasons discussed above, I find that Petitioner has not established by preponderant evidence that her flu vaccine administered on October 6, 2017, caused her to suffer from SFN or sensory GBS. Therefore, Petitioner is not entitled to compensation, and I must **DISMISS** her claim. [37]

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master

[37] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.